AO 91 (Rev. 11/11)   Criminal Complaint

**FILED**
CLERK, U.S. DISTRICT COURT

6/22/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _Valeria Huerre_ DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

06/22/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____DM_____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 2:21-mj-02973 |
| BILLY FREDERICK | ) | |
| aka A4SBILL@GMAIL.COM, | ) | |
| aka BILLME@GMAIL.COM | ) | |
| | ) | |
| | ) | |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 9, 2020_____ in the county of _____Los Angeles_____ in the

_Central District_ District of _____California_____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. 2251(c) | Production of Child Pornography |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Sharon S. Lee, Special Agent (HSI)
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  _6/22/21_

_____
_Judge's signature_

City and state:  _____Los Angeles, California_____    Hon. Charles Eick,  United States Magistrate Judge
_Printed name and title_

_AUSA:_ Yu, x2431

## <u>AFFIDAVIT</u>

I, Sharon S. Lee, being duly sworn, declare and state as follows:

## I.  <u>INTRODUCTION</u>

1.  I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since February 2019.

## II. <u>PURPOSE OF AFFIDAVIT</u>

2.  This affidavit is made in support of a criminal complaint against, and arrest warrant for, Billy Edward Frederick also known as Bill Frederick ("FREDERICK), for violation of 18 U.S.C. § 2251(c): production of child pornography for transportation into the United States.

3.  By this affidavit, I also seek a search warrant for the following:

     a.   4520 182nd Street, Redondo Beach, CA 90278, as further described in Attachment A-1 (the "SUBJECT RESIDENCE"), and

     b.   the person of FREDERICK, described further in Attachment A-2.

4.  The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(2): distribution or receipt of child pornography, 18 U.S.C.  § 2252A(a)(5)(B): possession of child pornography, 18 U.S.C. § 2251(c): production of child pornography for transportation into the United States, and 18

1

U.S.C. § 2422(b): enticement (collectively, the "SUBJECT OFFENSES").

### III. <u>**BACKGROUND OF SPECIAL AGENT SHARON LEE**</u>

5.    I am currently assigned to the HSI Los Angeles Child Exploitation Task Force, where I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A.   I am a graduate of the Federal Law Enforcement Training Center ("FLETC") HSI Special Agent Training program, where I received formalized instruction about the nature of child exploitation and child pornography, and how to investigate these cases.

6.    Since graduating from FLETC, I have received additional training regarding investigating child exploitation and child pornography and have had the opportunity to observe and review various examples of child pornography in all forms of media including computer media.   In addition, I have conducted and participated in the execution of several search warrants that involved child exploitation and/or child pornography offenses.   Coordinating and assisting with these search warrants has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet and other digital platforms to further those offenses.

7.    Finally, I have spoken to other experienced law enforcement officers concerning the results of their own investigations into child sex trafficking cases and cases in

which an adult purchasing child pornographic material from others in different country or state and the methods and practices of people who commit such crimes.

8.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### IV. **TRAINING & EXPERIENCE ON GOOGLE**

9.   Based on a review of information provided by Google regarding its services, information provided by other law enforcement officers, and/or my training and experience, I am aware of the following:

10.   Google provides numerous free services to users with a Google account. These services include, Gmail, Google Drive, Google Hangouts and Google Photos. Gmail is a web-based email service. Google Drive is a file storage and synchronization service which provides users with cloud storage, file sharing, and collaborative editing.  Google Hangouts is a messaging application that allow users to connect via talk, text or video. Google Photos is an image hosting and sharing web service that allows users with a Google account to store and share images for

free.  The username for a Google account is the email address
linked to the account.

11.  In my training and experience, I have learned that
providers of e-mail and/or social media services offer a variety
of online services to the public.  Subscribers obtain an account
by registering with Google.  In my training and experience, e-
mail and social media providers generally ask their subscribers
to provide certain personal identifying information when
registering for an e-mail or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative e-
mail addresses, and, for paying subscribers, means and source of
payment (including any credit or bank account number).  In my
training and experience, e-mail and social media providers
typically retain certain transactional information about the
creation and use of each account on their systems.  This
information can include the date on which the account was
created, the length of service, records of login (i.e., session)
times and durations, the types of service utilized, the status
of the account (including whether the account is inactive or
closed), the methods used to connect to the account (such as
logging into the account via the provider's website), and other
log files that reflect usage of the account.

12.  In addition, e-mail and social media providers often
have records of the Internet Protocol ("IP") address used to
register the account and the IP addresses associated with
particular logins to the account.  Google will send

verifications to a user in order to verify information the user lists on their Google account.  The verification typically involves a process in which the Electronic Service Provider ("ESP") sends an email, text message, or voice verification to the phone number listed and verifies the information when the subscriber responds to the ESP's email, phone call or text message.

### V.  SUMMARY OF PROBABLE CAUSE

13.  In July 2020, NCMEC received multiple CyberTipline ("CT") Reports from Google containing information indicating that Billy Frederick, also known as Bill Frederick ("FREDERICK"), used A4SBILL@GMAIL.COM ("ACCOUNT 1") and BILLME@GMAIL.COM ("ACCOUNT 2" and collectively, with ACCOUNT 1, the "ACCOUNTS") to upload suspected child sexual abuse material ("CSAM") into the ACCOUNTS.  Google further indicated that the ACCOUNTS were connected to Google Hangouts where CSAM images were being produced and shared by individuals from the Philippines.

14.  On or about March 3, 2021, pursuant to a 2703 warrant, I obtained content from Google regarding the ACCOUNTS.  In reviewing this content, I discovered additional CSAM, along with conversations and screenshots of money transfers indicating that FREDERICK paid individuals in the Philippines to produce and send him CSAM images and videos.

15.  I further investigated FREDERICK's location, and through Internet Protocol Addresses ("IP Address") captured in the various CT Reports provided by Google and information

provided by Coinbase, as well as his California driver's license and his vehicle registrations, I believe FREDERICK currently lives at the SUBJECT RESIDENCE.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

16.   I obtained the following information from my review of NCMEC CT Reports, content found in the ACCOUNTS pursuant to a 2703 warrant to Google, and information found from publicly available and law enforcement databases.   Attached as **Appendix 1** is a glossary of defined terms commonly used in child exploitation investigations based on my training and experience as well as in consultation with my fellow agents.   Additionally, I have spoken with other HSI SAs who have knowledge of this case and have read their investigative notes.

### A.   Investigative Referral  and Initial Investigation Indicating the user of the ACCOUNTS Possessed and Solicited for CSAM

17.   On or about July 18, 2020, HSI Los Angeles received an Investigative Referral from HSI Attaché Manila, Philippines stating that they received NCMEC CT Reports indicating that an individual utilized the ACCOUNTS to solicit CSAM from individuals in the Philippines.   On or about August 11, 2020, I received numerous NCMEC CT Reports which provided information from Google that indicated suspected CSAM files were found in the ACCOUNTS.   Google further provided those suspected CSAM files.   Based on my review of those files, I also believed several of the images and videos depicted CSAM.   As such, I applied for a search warrant for the ACCOUNTS.

18.   On January 6, 2021, a United States Magistrate Judge, the Honorable Jean Rosenbluth, signed a Google search warrant in the matter of the search of the ACCOUNTS in case number 2:21-MJ-00057 (See **Exhibit 1**).

19.   In response, on or about March 3, 2021, Google uploaded content associated with the ACCOUNTS, limited to that which occurred on or after December 1, 2017 through January 7, 2021, into the Google Law Enforcement Portal.  Based on my ongoing review of the content provided by Google, I have seen CSAM images and videos, including but not limited to several of the CSAM images and videos provided with the CT Reports.

**B.   FREDERICK is the User of the ACCOUNTS**

20.   Based on the following information discovered during my investigation, I believe the user of ACCOUNT 1 is the same user as ACCOUNT 2 and that the user of the ACCOUNTS is FREDERICK, who resides at the SUBJECT RESIDENCE.

1.   Account 1

21.   According to subscriber information provided by Google, the subscriber of ACCOUNT 1 is "Bill Frederic", DOB June 4, 1970. The phone number associated with ACCOUNT 1 for account recovery, sign in, user, and/or reachable phone number is 310-893-0829, verified[1] on November 04, 2017 at 17:33:27 UTC.  Google provided information which shows that 310-893-0829 is a Google Voice number subscribed to ACCOUNT 2.

---

[1] According to Google, phone number(s) are provided by the account holder. "Verified" indicates the accountholder responded to a text sent to the phone number provided by the user, which allows Google to "verify" the person's identity.

22.   Further records from Google show that one residential
address, the SUBJECT RESIDENCE, is listed in ACCOUNT 1 under the
name Bill Frederick in the account's Google Wallet.  Based on my
training and experience, I know that Google Wallet is a mobile
payment system that acts as a virtual wallet, allowing users to
make payments and transfer money straight from their mobile
devices. Google Wallet keeps credit cards, and debit cards,
among other things, on the user's mobile device for quick and
easy access. In order to pay using a credit and/or debit card,
the user must initially provide information such as the card
number and the billing address.  "Bill Frederick" is the only
name found in the Google Wallet for ACCOUNT 1.

23.   In addition, in ACCOUNT 1, I found an image of a
United States of America passport, passport number 507047597,
belonging to Billy Edward Frederick, DOB June 4, 1970 – further
information linking ACCOUNT 1 to FREDERICK.

24.   To further corroborate FREDERICK's location at the
SUBJECT RESIDENCE, I queried the California Department of Motor
Vehicles and it listed that FREDERICK reported that he lives at
the SUBJECT RESIDENCE; the license is valid until June 4, 2022
and to date, there has not been a change of address reported to
the California Department of Motor Vehicles.  The photograph of
the individual on the driver's license matches the individual
photographed in the aforementioned USA passport.

    2.   ACCOUNT 2

25.   According to subscriber information provided by
Google, the subscriber of ACCOUNT 2 is "Bill Frederick", DOB

8

June 4, 1980.[2]  The phone numbers listed as account recovery and/or user phone number(s) are 310-991-8736, verified on September 12, 2014 at 07:27:01 UTC, and the same phone number that was listed in ACCOUNT 1, 310-893-0829, verified by ACCOUNT 2 on August 01, 2017 at 23:00:05 UTC.

26.  On or about December 8, 2020, I served Verizon Wireless with DHS Summons, ICE-HSI-LA-2021-00124, requesting subscriber information for 310-991-8736. On or about December 9, 2020, Verizon provided me information showing that from March 17, 2001 to present, the subscriber of 310-991-8736 was FREDERICK at the SUBJECT RESIDENCE.

27.  Further records from Google show that one residential address, the SUBJECT RESIDENCE, is listed in ACCOUNT 2 under the name Bill Frederick in the account's Google Wallet.  "Bill Frederick" is the only name found in the Google Wallet.

28.  Additional information from Google shows that ACCOUNT 2 provided a recovery email address, WIL_90032@YAHOO.COM, which is the same recovery email for ACCOUNT 1. ACCOUNT 2 further provided an alternative email, BILL.ME@OUTLOOK.COM, which is listed as the alternative email for WIL_90032@YAHOO.COM.

---

[2] FREDERICK's real birthdate, as on a copy of his passport, appears to be June 4, 1970.  The birthdate for Account 2, however, is 10 years later, in 1980.  In my training and experience, individuals sometimes provide a fake birthday when creating online accounts and profile to conceal their identity or to create additional accounts if one account is suspended for misuse.

**C.  IP Address Information from Coinbase Supports that FREDERICK is located at the SUBJECT RESIDENCE**

29.  In addition, on or about June 11, 2021, I sent Coinbase[3] a DHS Summons, ICE-HSI-LA-2021-00713, for any accounts relating to FREDERICK, FREDERICK's known email addresses, and the SUBJECT RESIDENCE.  That same day, Coinbase provided me information regarding an account, User ID 57735060d677dc23550003a9, that matched the identifiers I submitted in the summons request.

30.  I reviewed the information regarding this account, which shows that the account user's name is FREDERICK and the address provided by the user is the SUBJECT RESIDENCE.  Coinbase further informed me that the account was verified through a photo of a driver's license submitted by the user.  I examined the photo of the driver's license and saw that the driver's license belonged to FREDERICK at the SUBJECT RESIDENCE.

31.  Coinbase further provided IP Addresses that were captured from various activities including but not limited to sign-ins, sign-outs, profile updates, and money transfers. Notably, from February 21, 2019 to June 11, 2021, Coinbase captured IP address 172.114.33.9 (the "TARGET IP"), the same IP address reported by Google in the CT Reports regarding the sign-ins of the ACCOUNTS – totaling approximately 1,069 times.

32.  Moreover, as recently as 11 days in June 2021, according to Coinbase, the TARGET IP was captured 29 times.

_____

[3] Based on my training and experience, Coinbase is a website that allows users to invest, trade, or store cryptocurrencies, such as bitcoin.

33.    Separately, on or about December 8, 2020, I sent a summons, ICE-HSI-LA-2021-00114, to Charter regarding the TARGET IP during June 3, 2020 through July 8, 2020 which resulted back to the SUBJECT RESIDENCE.

**D.    Surveillance of the SUBJECT RESIDENCE**

34.    On or about January 26, 2021, at approximately 11:00 AM PST, I conducted surveillance at the SUBJECT RESIDENCE.  I saw several vehicles parked in the underground gated parking garage below the condominium complex.  Notably, I saw a silver sedan with CA license plate 5UNM030.  A law enforcement record check yielded a 2006 Acura with valid registration from February 8, 2021 to February 8, 2022.  The registered owner of the vehicle is FREDERICK at the SUBJECT RESIDENCE.

35.    On or about May 7, 2021, HSI SA Danny Yao and I conducted surveillance at the SUBJECT RESIDENCE.  I saw the parking garage and I noticed a different car parked in the stall where I last observed FREDERICK's 2006 Acura on January 26, 2021.  The car parked in the stall was a white sedan with temporary CA license plate BL89E86.  A law enforcement records check yielded a 2015 Acura with valid temporary license plate from April 21, 2021 to July 20, 2021.  The registered owner of the vehicle is FREDRICK at the SUBJECT RESIDENCE.

36.    On or about May 12, 2021, I again conducted a law enforcement records check for the temporary CA license plate BL89E86.  Results indicated that a permanent license plate number was assigned to the vehicle, CA license plate 8WEG286.  A search for CA license plate 8WEG286 yielded the same 2015 Acura,

11

with valid registration from December 12, 2020 to December 12, 2021. The registered owner of the vehicle is still FREDERICK at the SUBJECT RESIDENCE, which leads me to leave that FREDERICK recently bought this 2015 Acura (in April 2021), and still lives at the SUBJECT RESIDENCE.

37.  Finally, SA Danny Yao told me that, on or about June 21, 2021, at approximately 4:50 PM PST, he drove by the SUBJECT RESIDENCE.  In the parking garage, SA Yao saw the 2015 Acura bearing CA license plate 8WEG286 (registered to FREDERICK at the SUBJECT RESIDENCE) still – which is the same car I saw during May 7, 2021 surveillance.  The car was parking in the same stall as the other car I saw in January 2021, the 2006 Acura, also registered to FREDERICK at the SUBJECT RESIDENCE.

38.  While I have attempted to conduct surveillance at the SUBJECT RESIDENCE on approximately three occasions, it is difficult to do so safely and without detection because although the building complex has a public lobby, there is a locked door that separates the lobby from the units.  The lobby is small and bare, with minimal items such as the unit's mailboxes and a notification board.  There is no seating in the lobby and loitering in the lobby would cause suspicion.  Furthermore, each individual unit (such as FREDERICK's residence), has its own white plastic fence – as pictured in Attachment A-1.  To conduct continued surveillance of this location could cause FREDERICK to suspect police activity, flee, and/or destroy evidence.

39.  Based on the collective surveillance of the team, information from the ACCOUNTS, IP addresses from various

sources, as well as my total investigation to date, I believe that FREDERICK still lives at the SUBJECT RESIDENCE and that a search of the SUBJECT RESIDENCE will reveal evidence of the SUBJECT OFFENSES.

### E.   FREDERICK's Production of Child Sex Abuse Material on July 9, 2020

40.   During my search of ACCOUNT 2, I found a video titled, 20200709_024403, that appears to be a 9 minute 59 second video recording of a Google Hangout video call.  According to the metadata provided by Google, the video was taken on or about July 9, 2020 at approximately 9:54:06 AM UTC.  The video depicts a nude minor male, approximately 11-14 years old, masturbating against a bright green wall.  At the start of the video, a red dot timer is seen counting up, indicating that the video call is being recorded.  In the bottom right corner of the video is another screen that appears to be of an adult male.  The video is silent; however, the minor's mouth is moving, as if he is interacting with the caller.  At approximately 1 minute and 16 seconds, video option icons (such as volume, end call, and turn off camera) appear on the screen.  During this time, the bottom right screen is labeled "You" and the top of main screen is labeled "the first name of the minor male victim ("MMV")[4]".

41.   At approximately 1 minute and 26 seconds, while the video call is still ongoing, the screen switches to the Hangout

---

[4] The name is concealed to protect the individual who is believed to be a minor male victim.  During the course of investigation, it appears there are various spellings for the minor male victim's first name.  All variations will be referred to as "MMV".

chat screen with MMV, where there is a photo sent from MMV of a headless male sitting on a bed with the same bright green walls as the video, holding his erect penis.  Under the photo is a text saying, "call me now master pls".  The text appears to have been sent 1 minute prior.  "You" sends a message that says, "It's dark babe" and goes back to the video call.  MMV then moves to a different spot on the bed where there is better lighting and continues to masturbate.

42.  At approximately 5 minutes and 13 seconds, "You" appears to turn off his camera and an avatar resembling FREDERICK is seen.  "Avatars" are self-created cartoon images that Google allows; based on my training and experience, people create these avatars typically to resume what they look like.  I compared various images of FREDERICK acquired during this investigation (for example, his passport photo and his DMV photo) to this avatar and believe that the avatar resembles FREDERICK.

43.  During this time, MMV is still masturbating. At approximately 7 minutes and 42 seconds, "You" turns the camera back on.  At this time, I saw "You" get up and go to the refrigerator.  At approximately 9 minutes and 43 seconds, "You" opened the refrigerator again and the light from the refrigerator reveals "You"'s face, which I believe was FREDERICK based on my knowledge and participation in this investigation, and also in comparing the various images of FREDERICK acquired during this investigation (for example, his passport photo and his DMV photo) to the person in the video.

14

**F.    Messages Between ACCOUNT 2 and MMV's Google Account Discuss Solicitation and Payment for Aforementioned July 29, 2020 Video Call**

44.    During my search of ACCOUNT 2, I discovered messages between FREDERICK and MMV's Gmail account, which I believe relate to the Google video.

45.    Within the messages, I came across the photo and texts that were exchanged during the aforementioned Google Hangout screen recording.  A review of the messages establish that the photo MMV sent the photo on July 9, 2020, at approximately 9:43:45 UTC, and that the Google Hangout started approximately 1 second after.

46.    Leading up to the initiation of the Google Hangout, MMV asked FREDERICK, whom he called "master," to let him borrow 2000, to send it to his brother, and that he needed this money to "buy a boxer short and brief."  In response, FREDERICK said he was about to fall asleep and he does not have money ready. Approximately 9 minutes later, FREDERICK made several Google Hangout attempts which appear to get disconnected due to bad connection, and in the interim, he continued to chat with MMV, telling him "[s]how me your underwear," "[n]o video" and "[k]eeps cutting out," which I believe was him saying that the connection was not strong but that when they connected, FREDERICK wanted to see MMV's underwear.  Between the attempted video calls, MMV sent FREDERICK two CSAM images.  One image is the same photo that was seen during the recorded video call and second image is similar, except the minor male is not holding his penis.

15

47.   Immediately after the Google Hangout video call ends, between approximately 09:56:12 UTC – 10:07:06 UTC the following messages were exchanged between ACCOUNT 2 – used by FREDERICK – and MMV's account.  The following is a portion of the messages and not intended to be a full and complete account of what the two discussed:

> ACCOUNT 2: "You have a big dick now. It's grown so much in a few years."
>
> MMV: "yes" "master wish u can send 7500 pesos[5] to my brother" "pls" "to my brother coins pls master"
>
> ACCOUNT 2: "Okay" "Good effort"
>
> MMV: [CSAM image of a minor male, naked on his back with what appears to be a flaccid penis, which appears to be a self-produced image based on the angle and context] "do u love my effort"
>
> ACCOUNT 2: "Yes babe. I like your body. Nice Chest."
>
> MMV: "hehe" "thank u" "did you send to my brother master"
>
> ACCOUNT 2: "Your English has improved also" "Yes I did"
>
> …
>
> MMV: "are u sure master did u send it"

---

[5] Based on my participation in this investigation, I believe that MMV is located in Philippines because of contextual information in this chat (for example, MMV references "pesos" in this exchange and the Philippine currency is the peso and 7500 pesos is approximately $156 USD), other chats, and IP address information.  Furthermore, Google captured MMV's login and upload IP Addresses and provided them in a CT Report.  According to the CT Report, the IP Addresses resolved back to the Philippines.

ACCOUNT 2: "Yes" "I messaged John alert"

MMV: "ok master sorry"

ACCOUNT 2: "It takes about 29 minutes to show up
    normally" "20 minutes"

48.  Based on my training and experience, I believe that
FREDERICK – using ACCOUNT 2 – obtained CSAM from MMV, who is
located in another country (based on his request for "pesos"
instead of dollars and FREDERICK's compliment that MMV's
"English has improved also").  Moreover, I believe there is a
long-term master/servant relationship between the two, given
FREDERICK's statement that MMV's "dick" has "grown so much in a
few years," and MMV's use of the word "master" four times to
refer to FREDERICK in this one short excerpted conversation.[6]
Finally, I believe FREDERICK used, induced, persuaded, and/or
enticed MMV into sending this CSAM in exchange for compensation
because the two discussed payment again, with MMV asking "master
wish you can send 7500 pesos to my brother," "to my brother
coins pls master," "did you send to my brother master," and "are
u sure master did u send it."  Additionally, the two agreed on
the terms of compensation ("7500 pesos"), with FREDERICK telling
MMV to put in "[g]ood effort" before MMV sent self-produced
CSAM.

**G.   FREDERICK's Long-Term Interest in Boys**

49.  During my search through ACCOUNT 2, I discovered many
CSAM images of young nude male minors ranging from approximately

---

[6] Further bolstering my belief is that MMV refers to
FREDERICK as "master" over 500 times in chats from April 2018 to
July 2020.  MMV also, at times, refers to himself as "slave."

6 years of age to 15 years of age.  Further, I discovered
messages where FREDERICK would discuss the solicitation of CSAM
of young boys, including enticement to engage in sexually
explicit activity.

50.  For example, in messages from around April 27, 2018,
MMV asked FREDERICK for 2800 to pay for basketball summer
clinic.  FREDERICK said he did not have the money and MMV
continued to ask.  The following is an excerpt from the
conversation:

ACCOUNT 2: "I don't have it yet."

MMV: "Master pls and dont tell my brother" "pls i
    really want basketball" "I am the captain ball thats
    why i need to get there [crying emoji]"

ACCOUNT 2: "I asked him if I could watch him fuck your
    little butt" "I didn't say anything else" "okay I will
    borrow money MMV but I want to watch you get fucked
    again" "to John?"

MMV: "To ethan" "I told ethan just to be quiet" "My
    mom will get it"

ACCOUNT 2: "Ok it should be available to Ethan in
    about a half hour" "You need dick in your butt and
    mouth again"

MMV: "Yes master"

ACCOUNT 2: "Good boy"

MMV: "Did you send it? Master"

ACCOUNT 2: "I asked Ethan to bill me" "I am ready"

MMV: "thanks master"

ACCOUNT 2: "Sent"

MMV: "Thanks master see you soon"

51.   In May 5, 2018, it appears that the request CSAM video was made.   The follow messages were sent between FREDERICK and MMV:

> MMV: "Master we already make it but my brother phone
> is broken the files was there" "About the videos
> master sorry if I cant take in all the dick of my
> brother its very huge only the head is very hurt to my
> asshole" "Help my brother to fix his phone the files
> was saved there"
>
> …
>
> MMV: "What do we do now to our photos and videos"
>
> ACCOUNT 2: "I will ask your brother"

52.   Based on my training and experience, the messages from April to May 2018 show FREDERICK's enticement of boys to commit sex acts ("I want to watch you get fucked again" and "You need dick in your butt and mouth again") as well as MMV successfully producing said content, and apologizing for his inability to complete the task to FREDERICK's satisfaction ("sorry if I cant take in all the dick of my brother").

53.   Later in these chats, starting on or about March 9, 2020, someone claiming to be MMV's mom told FREDERICK, "my son [MMV] had a bike accident his leg is beoken" and "what's your deal about my son and I saw it and agree to do that because your helping my son [MMV]," and "we're just poor so I agree to my son for what his doing," which, based on my training and experience,

as well as my review of the messages between ACCOUNT 1 and MMV, shows her agreement to allow MMV to be used by FREDERICK.

   a.   She continued to ask for money to help MMV's broken leg, saying "we really need to take him" and "how can I repay u sir," to which FREDERICK says "MMV will repay me.  I will tell him what I want to see," and "It is the only thing MMV has to offer me is his body," "I like seeing him naked sometimes," and "[t]hanks for being open minded."

   b.   Then, in March 29, 2020, it appeared that MMV returned because he messaged FREDERICK with "Master", to which FREDERICK said "it's about time pls", and "I want to offer u my naked body" with "200 photos."  FREDERICK corrected MMV, saying "I think I paid for it last time" and "[b]efore you got into trouble you took photos for me if I recall" and "I paid for the photos and then I paid because you got into trouble" and "I'm still waiting for the photos" "[t]hat I paid for."  Later, FREDERICK appeared to have received some photographs because he told MMV "[s]everal of your photos are stunning," "I love when you stand showing me everything," followed later by "I want you to fuck your brother."

   54.   In some messages, FREDERICK also provided instructions on the types of boys that he liked.  One example is a message exchanged between FREDERICK, using ACCOUNT 2, and a person who represented that she was MMV's mom, using MMV's account, on April 21, 2020 at approximately 08:26:15.

        MMV: "Mr billfrederick"

        ACCOUNT 2: "MMV you have to find a younger boy this

time"

MMV: "Yes it's me her mom"

ACCOUNT 2: "Sorry but I helped you many times for not in return" "Sorry I like him naked but I want more after last time"

MMV: "Yes like I promise me my self I will prefare a little boy hidely" "That's a promise"

ACCOUNT 2: "Ok"

MMV: "I do what I can do" "But you know the rules if I find a boy u need to pay it also"

ACCOUNT 2: "Yes JP[7] knows how I offer to help young boys."

MMV: "okay" "Can you send to jp and add a fee" "500 pesos"

ACCOUNT 2: "I don't know what MMV needs for his health" "Want a boy that is 9 to 12 with MMV"

MMV: "8000" "Don't worry I will find for u sir" "can u send to jparks now sir"

55.  Based on my training and experience, this exchange shows FREDERICK's interest in obtaining a child to produce sex abuse material – for example, he instructed MMV's mom to "find a younger boy this time," as if complaining that the ones he had seen before were not young enough.  In response, the person using MMV's account, who self-identified as "her mom," said

---

[7] Based on my investigation JP is believed to be an adult male using jparkssantos1987@gmail.com.

"[b]ut you know the rules if I find a boy u need to pay it also," requesting payment based on previously established rules, and specifically requested "500 pesos."  FREDERICK then made a specific request for "a boy that is 9 to 12 with MMV," with MMV's mom quoting him "8000" and instructing FREDERICK to send the amount to another account.  Based on my training and experience, FREDERICK's instructions are consistent with attempting to obtain a child for the purposes of producing child sex abuse material, and enticement to engage in sex acts.

56.  In summary, in my review of data from the ACCOUNTS, I have seen what appear to be conversations with various individuals[8] from the Philippines, and the ACCOUNTS' emails yielded many CSAM images, videos and evidence of money transfers using online services such as WorldRemit, Coins, Bitcoin, Coinbase, and Rebit.  Any financial accounts with these and other financial companies may shed light on transfers associated with the SUBJECT OFFENSES.

## VII.  TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN

57.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images

---

[8] Throughout his chats with MMV, FREDERICK also complained that he had other boys and therefore did not have money to send to MMV.  For example, on or about December 23, 2019, he told MMV "Ten boys begging me and only enough to help one," "So I can't babe," "Everyone sends at once," and "I'm not a fucking bank."

of children, and that there are certain characteristics common
to such individuals:

     a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children; or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or in other visual media, or from literature
describing such activity.  These individuals often maintain
possession of these items for long periods of time and keep
their collections in numerous places – in digital devices in
their homes, in their cars, in their workplaces, or on their
persons.  Based on my training and experience, child
exploitation crimes are often ongoing crimes; here, FREDERICK
expressed sexual desires relating to MMV from at least May 2018
to July 2020, showing his long-standing interest in children,
his means to pay for such child sex abuse content, and evidence
relating to the SUBJECT OFFENSES could be found in the SUBJECT
RESIDENCE or on FREDERICK's person.

     b.   Individuals who have a sexual interest in
children or images of children also may correspond with and/or
meet others to share information and materials (including
through digital distribution via the Internet); conceal such
correspondence as they do their sexually explicit material; and
often maintain lists of names, addresses, and telephone numbers
of individuals with whom they have been in contact and who share
the same interests in child pornography.  These individuals

23

often maintain possession of these items for long periods of time.

       c.   Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

       d.   Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT RESIDENCE or on his person.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT RESIDENCE and FREDERICK could lead to evidence of the child exploitation offenses.

e.   Where, as here, the crimes have been ongoing for years, and FREDERICK appears to be aware of law enforcement efforts in the Philippines, he may have additional mechanisms and/or protections against law enforcement detection on his digital devices, which would necessitate a longer period of time to review.  For example, in a conversation starting February 27, 2020, MMV and FREDERICK discussed how one of their co-conspirators – who had been caught "uploading photos of naked boy" – was in jail, to which FREDERICK said "I willmtry [sic] to keep them out of jail," that the co-conspirator "wasn't careful," and "[s]omeone will have to tell me so I know if I can afford the bail."  In another conversation with another individual dated June 16, 2020, the other participant told FREDERICK "the young boy u like was caught by police yesterday" and "his in jail," to which FREDERICK said "I need to know the total cost for everything to help you" regarding bail.  The other participant informed FREDERICK "someone following us," to which FREDERICK responded "Oh yeah I've heard that undercover police follow boys."  Later in the conversation, the other participant appeared to confirm he had received money, stating "u send 5000" but "we needed 15000 today to release my brother." Based on my training and experience as well as my review of these conversations, I believe that FREDERICK expressed his awareness of law enforcement efforts against his co-conspirators in another country, and offered to help with bail.  These 2020 conversations may have caused FREDERICK to be more vigilant against law enforcement detection, including the use of

additional encryption and other protections on his digital
devices.

> ### VIII.   TRAINING & EXPERIENCE ON DIGITAL DEVICES[9]

58. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

    a.   A person who connects to the Internet must use a
computer or mobile device, such as a tablet or wireless
telephone, to facilitate that access.  Furthermore, in my
training and experience, these devices typically travel with a
subject or remain in SUBJECT RESIDENCE.  It is therefore
reasonable to believe that computers, tablets, wireless
telephones, and other electronic storage media may be present in
SUBJECT RESIDENCE.  Further, because it is possible to store
certain mobile devices, such as removable storage media and
wireless telephones, in a pocket, it is reasonable to believe
that mobile devices may be found on the persons.

    b.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,

---

[9] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

c.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

d.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

e.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

f.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

g.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

h.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

59.   The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   As noted above, I know that most homes with Internet capability use only one IP address.  That IP address, in turn, is often shared by many devices that access the Internet using a wireless modem.  Accordingly, if there are

29

multiple digital devices discovered during a search of the
SUBJECT RESIDENCE and FREDERICK, any of those devices could have
been used to access the Internet and download the files
discussed above.

       d.   Thus, if while executing the warrant, law
enforcement personnel encounter a digital device within the
scope of the warrant that may be unlocked using one of the
aforementioned biometric features, the warrant I am applying for
would permit law enforcement personnel to, with respect to
FREDERICK, during the execution of the search: (1) depress
FREDERICK's thumb- and/or fingers on the device(s); and (2) hold
the device(s) in front of the face of FREDERICK with his eyes
open to activate the facial-, iris-, and/or retina-recognition
feature.

      60.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## IX. <u>REQUEST FOR SEALING</u>

      61.  It is respectfully requested that this Court issue an
order sealing, until further order of the Court, all papers
submitted in support of this application, including the
application and search warrant affidavit.  I believe that
sealing is necessary because the items and information to be
seized is relevant to an ongoing investigation into criminal
conduct involving minor victims and as far as I am aware, the
targets of this investigation remain unaware that they are being
investigated.  Disclosure of the search warrant affidavit at

this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution.

62.   Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## X.  CONCLUSION

63.   Based on the foregoing, there is probable cause to believe that FREDERICK committed a violation of 18 U.S.C. § 2251(c): production of child pornography for transportation into the United States, and that evidence of the SUBJECT OFFENSES as described above and in Attachment B of this affidavit, will be found in the search of the SUBJECT RESIDENCE and on the person of FREDERICK.

_____
Sharon S. Lee,
Special Agent
Homeland Security
Investigations

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 22nd day of
___June___, 2020.

_____
HONORABLE CHARLES EICK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises, safes, safe deposit boxes, and digital devices located at 4520 182nd Street, Redondo Beach, CA 90278, (the "SUBJECT RESIDENCE"). The SUBJECT RESIDENCE is a three level condominium that is part of a gated condominium complex that houses approximately twenty units.

The complex building which includes the SUBJECT RESIDENCE is blueish grey in color with dark taupe trimmings. The front entrance to the complex has the numbers "4512 – 4540" written above the double glass front door. The front door to the complex lies at the top of a small flight of stairs. Inside the front door is a small lobby with mailboxes. Straight through the lobby, there is another glass door that leads to the inside of the complex. The front entrance to all the units are within the inside of the complex. Each unit has a white plastic fence surrounding their front porch and numbers, which is believed to be the number portion of each unit's address, on top of the fence door. The unit seen directly in front through the glass door of the lobby is labeled "4520" which is believed to be the SUBJECT RESIDENCE. The SUBJECT RESIDENCE is depicted in the four photographs below.









## ATTACHMENT A-2

**PERSON TO BE SEARCHED**

The person to be searched is identified as Billy Frederick, also known as Bill Frederick ("FREDERICK"), date of birth June 4, 1970, California driver's license number C6612174. According to the information on his license, FREDERICK has brown hair, green eyes, approximately 6 feet 2 inches in height and weight 225 pounds. The search of FREDERICK may include the property that is on his person and any property including digital devices on his person, including, but not limited to, any pockets in his clothing, and any bags or other containers carried or held by him, provided that he is located within the Central District of California at the time of the search. FREDERICK's CA license photo is depicted in the photograph below.



## ATTACHMENT B

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(2): distribution or receipt of child pornography, 18 U.S.C.  § 2252A(a)(5)(B): possession of child pornography, 18 U.S.C. § 2251(c): production of child pornography for transportation into the United States, and 18 U.S.C. § 2422(b): enticement (collectively, the "SUBJECT OFFENSES"),  namely:

a.    Child pornography, as defined in 18 U.S.C. § 2256(8).

b.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, and also including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order,

requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

g.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child

prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

h.    Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

i.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

j.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

k.    Financial records, ledgers, or other documents showing payment in connection with production and/or transmission of child sex abuse material or related expenses including accounts with financial institutions (Bank of America, U.S. Bank, Coinbase, etc.).

l.    Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to a4sbill@gmail.com and billme@gmail.com.

m.    Any records, documents, programs, applications, or materials which pertain to Dropbox, Citrix (Sharefile), or other cloud-based accounts used to share materials.

n.    Any records, documents, programs, applications, materials, and files relating to IP address 172.114.33.9.

o.    Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or

acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

p.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

q.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

r.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

43

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

      c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

45

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    During the execution of this search warrant, with respect to FREDERICK, during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of the warrant, law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of FREDERICK onto the

46

fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of FREDERICK with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

# APPENDIX 1

## I.  BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

1.  In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

2.  Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.  <u>Computers and Child Pornography</u>.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.  <u>File Storage</u>.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual servers accessible from any digital device with an Internet connection (i.e., "cloud storage").  Computer users

frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive.  Computer users also often create "backup," or duplicate, copies of their files.  In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

        c.   Internet.   The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.   The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.   In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

        d.    <u>Internet Service Providers</u>.    Individuals and
businesses obtain access to the Internet through ISPs.    ISPs
provide their customers with access to the Internet using
telephone or other telecommunications lines; provide Internet e-
mail accounts that allow users to communicate with other
Internet users by sending and receiving electronic messages
through the ISPs' servers; remotely store electronic files on
their customer's behalf; and may provide other services unique
to each particular ISP.    ISPs maintain records pertaining to
the individuals or businesses that have subscriber accounts with
them.    Those records often include identifying and billing
information, account access information in the form of log
files, e-mail transaction information, posting information,
account application information, and other information both in
computer data and written record format.

        e.    <u>IP Addresses</u>.    An Internet Protocol address ("IP
Address") is a unique numeric address used to connect to the
Internet.    An IPv4 IP Address is a series of four numbers, each
in the range 0-255, separated by periods (e.g., 121.56.97.178).
In simple terms, one computer in a home may connect directly to
the Internet with an IP Address assigned by an ISP.    What is
now more typical is that one home may connect to the Internet
using multiple digital devices simultaneously, including
laptops, tablets, smart phones, smart televisions, and gaming
systems, by way of example.    Because the home subscriber
typically only has one Internet connection and is only assigned
one IP Address at a time by their ISP, multiple devices in a

home are connected to the Internet via a router or hub. Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.   The router or hub "routes" Internet traffic so that it reaches the proper device.   Most ISPs control a range of IP Addresses.   The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.   Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

        f.   <u>IP Address – IPv6</u>.   Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.   An IPv6 consists of eight sets of combination of four numbers 0-9 and/or letters A through F.   An example of an IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

        g.   The following definitions:

        i.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.   Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.   This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

        ii.   "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet

in order to communicate electronically in real-time to other individuals.  Individuals may also have the ability to transmit links to electronic files to other individuals within the chat room.

iii. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iv.  "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

v.  "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.  Users of such a service can share links and

associated passwords to their stored files with other traders of
child pornography in order to grant access to their collections.
Such services allow individuals to easily access these files
through a wide variety of electronic devices such as desktop and
laptop computers, mobile phones, and tablets, anywhere and at
any time.  An individual with the password to a file stored on a
cloud-based service does not need to be a user of the service to
access the file.  Access is typically free and readily available
to anyone who has an Internet connection.

vi.  "Computer," as used herein, refers to "an
electronic, magnetic, optical, electrochemical, or other high
speed data processing device performing logical or storage
functions, and includes any data storage facility or
communications facility directly related to or operating in
conjunction with such device" and includes smartphones, other
mobile phones, and other mobile devices.  *See* 18 U.S.C.
§ 1030(e)(1).

vii. "Computer hardware," as used herein,
consists of all equipment that can receive, capture, collect,
analyze, create, display, convert, store, conceal, or transmit
electronic, magnetic, or similar computer impulses or data.
Computer hardware includes any data-processing devices
(including central processing units, internal and peripheral
storage devices such as fixed disks, external hard drives,
"thumb," "jump," or "flash" drives, which are small devices that
are plugged into a port on the computer, and other memory
storage devices); peripheral input/output devices (including

keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

viii.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

ix.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

x.    "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer

files from one host to another over a computer network, such as
the Internet.  FTP is built on client-server architecture and
uses separate control and data connections between the client
and the server.

xi.  "Encryption" is the process of converting
data into a code in order to prevent unauthorized access to the
data.

xii. The "Internet" is a global network of
computers and other electronic devices that communicate with
each other.  Due to the structure of the Internet, connections
between devices on the Internet often cross state and
international borders, even when the devices communicating with
each other are in the same state.

xiii.     "Internet Service Providers" ("ISPs"),
as used herein, are commercial organizations that are in
business to provide individuals and businesses access to the
Internet.  ISPs provide a range of functions for their customers
including access to the Internet, web hosting, email, remote
storage, and co-location of computers and other communications
equipment.

xiv. An "Internet Protocol address" or "IP
address," as used herein, refers to a unique numeric or
alphanumeric string used by a computer or other digital device
to access the Internet.  Every computer or device accessing the
Internet must be assigned an IP address so that Internet traffic
sent from and directed to that computer or device may be
directed properly from its source to its destination.  Most

Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

        xv.  "Log files" are records automatically produced by computer programs to document electronic events that occur on computers.  Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors.  Logs are often named based on the types of information they contain.  For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

        xvi. "Minor," as defined in 18 U.S.C.  § 2256(1), refers to any person under the age of eighteen years.

        xvii.   "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

        xviii.   "Records," "documents," and "materials," as used herein, include all information recorded in

any form, visual or aural, and by any means, whether in
handmade, photographic, mechanical, electrical, electronic, or
magnetic form.

xix. "Remote computing service," as defined in 18
U.S.C. § 2711(2), is the provision to the public of computer
storage or processing services by means of an electronic
communications system.

xx. "Sexually explicit conduct," as defined in
18 U.S.C. § 2256(2), means actual or simulated (a) sexual
intercourse, including genital-genital, oral-genital, anal-
genital, or oral-anal, whether between persons of the same or
opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or
masochistic abuse; or (e) lascivious exhibition of the anus,
genitals, or pubic area of any person.

xxi. A "storage medium" or "storage device" is
any physical object upon which computer data can be recorded.
Examples include hard disks, RAM, floppy disks, "thumb," "jump,"
or "flash" drives, CD-ROMs, and other magnetic or optical media.

xxii.   "Visual depiction," as defined in 18
U.S.C. § 2256(5), includes undeveloped film and videotape, data
stored on computer disc or other electronic means which is
capable of conversion into a visual image, and data which is
capable of conversion into a visual image that has been
transmitted by any means, whether or not stored in a permanent
format.

i.   A "Website" consists of textual pages of
information and associated graphic images.  The textual

information is stored in a specific format known as Hyper-Text
Mark-up Language (HTML) and is transmitted from web servers to
various web clients via Hyper-Text Transport Protocol (HTTP).

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

|  |  |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>"a4sbill@gmail.com" and "billme@gmail.com"<br>that are within the possession, custody,<br>or control of Google LLC | ) ) ) ) ) ) |

Case No. 2:21-MJ-00057

## APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

- ☑ Evidence of a crime;
- ☑ Contraband, fruits of crime, or other items illegally possessed;
- ☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Production of child pornography |
| 18 U.S.C. § 2252A(a)(2) | Distribution or receipt of child pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | Possession of child pornography |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

Sharon S. Lee, Special Agent - HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 6, 2021

City and State: Los Angeles, CA

*Judge's signature*

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jeffrey M. Chemerinsky, (x.6520)

Case 2:21-cr-00040-DSF Document 1 Filed 06/23/21 Page 63 of 101 Page ID #:72
Page ID #:72
Case 2:21-mj-00057-DUTY *SEALED*   Document 1 *SEALED*    Filed 01/06/21   Page 2 of 40
Page ID #:2

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the following accounts identified as:

       a. a4sbill@gmail.com ("ACCOUNT 1")

       b. billme@gmail.com ("ACCOUNT 2")

that is within the possession, custody, or control of Google LLC (the "PROVIDER"), a company that accepts service of legal process at 1600 Amphitheatre Pkwy, Mountain View, CA 94043, regardless of where such information is stored, held, or maintained.

Case 2:21-cr-00840-DSF Document 1 Filed 06/23/21 Page 64 of 101 Page ID #:73
Page ID #:73
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 3 of 40
Page ID #:3

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

**I.**       **SEARCH PROCEDURES**

1.    The warrant will be presented to personnel of the
PROVIDER, who will be directed to isolate the information
described in Section II below.

2.    To minimize any disruption of service to third
parties, the PROVIDER's employees and/or law enforcement
personnel trained in the operation of computers will create an
exact duplicate of the information described in Section II
below.

3.    The PROVIDER's employees will provide in electronic
form the exact duplicate of the information described in Section
II below to the law enforcement personnel specified below in
Section IV.

4.    With respect to contents of wire and electronic
communications produced by the PROVIDER (hereafter, "content
records," see Section II.10.a. below), law enforcement agents
and/or individuals assisting law enforcement and acting at their
direction (the "search team") will examine such content records
pursuant to search procedures specifically designed to identify
items to be seized under this warrant. The search shall extract
and seize only the specific items to be seized under this
warrant (see Section III below). The search team may use
forensic examination and searching tools, such as "EnCase" and
"FTK" (Forensic Tool Kit), which tools may use hashing and other
sophisticated techniques, including to search for known images

of child pornography.  The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed—and preserved by the search team for authenticity and chain of custody purposes—until further order of the Court.

2

Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 66 of 101 Page ID #:75
Page ID #:75
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 5 of 40
Page ID #:5

Thereafter, the search team will not access the data from the
sealed original production which fell outside the scope of the
items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found
in this warrant govern only the search of digital data pursuant
to the authority conferred by this warrant and do not apply to
any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an
agent is not required for service or execution of this warrant.

**II.        INFORMATION TO BE DISCLOSED BY THE PROVIDER**

10.    To the extent that the information described in
Attachment A is within the possession, custody, or control of
the PROVIDER, regardless of whether such information is located
within or outside of the United States, including any
information that has been deleted but is still available to the
PROVIDER, or has been preserved pursuant to a request made under
18 U.S.C. § 2703(f), the PROVIDER is required to disclose the
following information to the government for the ACCOUNTS listed
in Attachment A:

a.    All contents of all wire and electronic communications
associated with the ACCOUNTS, limited to that which occurred on or
after December 1, 2017 to present, including:

i.    All emails, communications, or messages of
any kind associated with the ACCOUNT, including stored or
preserved copies of messages sent to and from the account,
deleted messages, and messages maintained in trash or any other
folders or tags or labels, as well as all header information

3

associated with each e-mail or message, and any related documents or attachments.

      ii. All records or other information stored by subscriber(s) of the ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

      iii. All folders and files associated with the ACCOUNTS, including stored or preserved copies of files sent to and from the account, the source and destination addresses associated with file, the date and time at which each file was sent, and any user-created organizational structure within the ACCOUNTS, or any files or messages saved in the account as a "draft" or in any other manner.

      iv. All transactional information of all activity of the ACCOUNTS described above, including log files, messaging logs, records of session times and durations, dates and times of connecting, and methods of connecting, and email "invites" sent or received via the PROVIDER, and any contact lists.

      v. All records pertaining to communications between the PROVIDER and any person regarding the ACCOUNTS, including contacts with support services and records of actions taken.

      b. All other records and information, including:

      i. All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's

full name(s), screen name(s), any alternate names, other account
names or e-mail addresses associated with the account, linked
accounts, telephone numbers, physical addresses, and other
identifying information regarding the subscriber, including any
removed or changed names, email addresses, telephone numbers or
physical addresses, the types of service utilized, account
status, account settings, login IP addresses associated with
session dates and times, as well as means and source of payment,
including detailed billing records, **and including any changes
made to any subscriber information** or services, including
specifically changes made to secondary email accounts, phone
numbers, passwords, identity or address information, or types of
services used, and including the dates on which such changes
occurred, for the ACCOUNTS.

ii. All user connection logs and transactional
information of all activity relating to the ACCOUNTS described
above in Section II.10.a., including all log files, dates,
times, durations, data transfer volumes, methods of connection,
IP addresses, ports, routing information, dial-ups, and
locations, and including specifically the specific product name
or service to which the connection was made.

**III.    INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11. For each ACCOUNT listed in Attachment A, the search
team may seize:

a. All information described above in Section
II.10.a. that constitutes evidence, contraband, fruits, or
instrumentalities of violations of 18 U.S.C. § 2251(a) (production

of child pornography), 18 U.S.C. § 2252A(a)(2) (distribution or

receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B)

(possession of child pornography), 18 U.S.C. § 2422(b), namely:

        i.    Information relating to who created,

accessed, or used the ACCOUNTS, including records about their

identities and whereabouts;

        ii.  Any messages, records, documents, or

materials that identify the user(s) of the ACCOUNTS;

        iii. Child pornography, as defined in 18 U.S.C.

§ 2256(8);

        iv.  Any files, records, or messages that refer

to child pornography, as defined in 18 U.S.C. § 2256(8),

including but not limited to documents that refer to the

possession, receipt, distribution, transmission, reproduction,

viewing, sharing, purchase, downloading, production, shipment,

order, requesting, trade, or transaction of any kind, involving

child pornography;

        ~~v.   Any files, records, or messages that refer to travel to the Philippines;~~ *JPR*

        ~~vi.  Any files, records, or messages that refer to any minor traveling from the Philippines to the United States;~~ *JPR*

        vii. Any files, records, or messages that refer

to Google, LLC., or any accounts with Google LLC.;

        viii.   Any files, records, or messages sent to

or from Google, LLC.;

        ix.  Any files, records, or messages tending to

Case 2:21-cr-00084-DSF Document 1 Filed 06/23/21 Page 70 of 101 Page ID #:79
Page ID #:79
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 9 of 40
Page ID #:9

identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256;

x.    Any files, records, or messages that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

xi.    Any and all files, records, or messages which are sexually arousing to individuals who are interested in minors.  Such material is commonly known as "child erotica" and includes images of children, written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings;

xii. Any files, records, or messages that pertain to accounts with any Internet Service Provider or any Electronic Service Provider;

xiii.    Any passwords, encryption keys, and other access devices that may be necessary to access folders and files in the ACCOUNTS;

b.    All records and information described above in Section II.10.b.

7

IV.     **PROVIDER PROCEDURES**

    12.    Notwithstanding 18 U.S.C. § 2252/2252A or any similar statute or code, the provider shall disclose responsive data by sending it to the following address via US Mail, or to the following email address:

        Sharon S. Lee
        Sharon.s.lee@ice.dhs.gov
        501 W. Ocean Blvd, Ste. 7200, Long Beach, CA 90802
        (310) 321-9241

    13.    IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

    14.    IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of the account identified in Attachment A of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

Case 2:21-cr-00340-DSF Document 1 Filed 06/22/21 Page 72 of 101 Page ID #:72
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 11 of 40 Page ID #:81
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 11 of 40 Page ID #:11

**AFFIDAVIT**

I, Sharon S. Lee, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since February 2019. I am currently assigned to the HSI Los Angeles Child Exploitation Task Force, where I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A. I am a graduate of the Federal Law, Enforcement Training Center ("FLETC") HSI Special Agent Training program, where I received formalized instruction about the nature of child exploitation and child pornography, and how to investigate these cases.

2.   Since graduating from FLETC, I have received additional training regarding investigating child exploitation and child pornography and have had the opportunity to observe and review various examples of child pornography in all forms of media including computer media. In addition, I have conducted and participated in the execution of several search warrants that involved child exploitation and/or child pornography offenses. Coordinating and assisting with these search warrants has given me an understanding of how people involved with

1

offenses relating to the sexual exploitation of children use the
Internet and other digital platforms to further those
offenses.  Finally, I have spoken to other experienced law
enforcement officers concerning the results of their own
investigations into child sex trafficking cases and cases in
which an adult purchasing child pornographic material from
others in different country or state and the methods and
practices of people who commit such crimes.

## II.  **PURPOSE OF AFFIDAVIT**

3.    I make this affidavit in support of an application for
a warrant for information associated with the following accounts
that are stored at premises controlled by Google LLC
("PROVIDER"), a provider of electronic communication and remote
computing services including Google Email (commonly known as
"Gmail"), Google Photos and Google Drive Accounts, headquartered
at 1600 Amphitheatre Pkwy, Mountain View, CA 94043:

      a.    a4sbill@gmail.com ("ACCOUNT 1")

      b.    billme@gmail.com ("ACCOUNT 2", and collectively
with ACCOUNT 1, the "ACCOUNTS").

4.    The information to be searched is described in
Attachment A.  This affidavit is made in support of an
application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[1] to require the PROVIDER

---

[1] The government is seeking non-content records pursuant to
18 U.S.C. § 2703(d).  To obtain the basic subscriber
information, which does not contain content, the government
needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To
obtain additional records and other information--but not
content--pertaining to subscribers of an electronic

to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B. Attachments A and B are incorporated herein by reference.

5. As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the ACCOUNTS constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of 18 U.S.C. § 2251(a) (production of child pornography), 18 U.S.C. § 2252A(a)(2) (distribution or receipt of child pornography), and 18 U.S.C. § 2252A(a)(5)(B) (possession of child pornography) (collectively, the "SUBJECT OFFENSES").

6. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient

---

communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d). The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

Case 2:21-cr-00340-DSF Document 1 Filed 06/22/21 Page 75 of 101 Page ID #:84
40 Page ID #:84
Case 2:21-mj-00057-DUTY *SEALED*  Document 1 *SEALED*  Filed 01/06/21  Page 14 of 40
Page ID #:14

probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  **SUMMARY OF PROBABLE CAUSE**

7.    On or about July 16, 2020 and July 17, 2020, the
National Center for Missing and Exploited Children ("NCMEC")
received electronically submitted tips, CyberTipline (CT)
Reports 74826265, 74835535, 74843878, and 74850994, from the
PROVIDER containing information indicating that Bill FREDERICK
("FREDERICK") used the ACCOUNTS to upload suspected child sexual
abuse material ("CSAM").  The PROVIDER indicated that the
reported suspected CSAM images were found in the ACCOUNTS'
Google Photo and Google Drive infrastructures.

8.    According to Internet Protocol Addresses ("IP
Address") captured in the various CT Reports provided by the
PROVIDER, it appears FREDERICK resides in the greater Los
Angeles Area.  Specifically, based on the address listed on his
California driver's license, it appears FREDERICK resides at
4520 182nd street, Redondo Beach, California 90278 ("SUBJECT
RESIDENCE").  As set forth below in more detail, I believe there
is probable cause to search the ACCOUNTS for evidence related to
the SUBJECT OFFENSES.

Case 2:21-mj-00057-DUTY *SEALED*   Document 1 *SEALED*   Filed 01/06/21   Page 15 of 40
Page ID #:15

## IV. DEFINITION OF TERMS REGARDING CHILD EXPLOITATION OFFENSES, COMPUTERS, AND THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN

9. In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

10. Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the National Center for Missing and Exploited Children ("NCMEC"), and the use of computers with child pornography:

### A. The National Center for Missing and Exploited Children

11. The NCMEC is a nonprofit organization in the United States working with law enforcement on issues relating to missing and exploited children. NCMEC provides information it receives from the public and Electronic Service Providers ("ESPs") to law enforcement agencies. ESPs are companies such as Google, which provide free and paid services online. These services may include e-mail, instant messaging, social networking, and online file transfer or storage. NCMEC sends information to law enforcement by way of CyberTipline reports.

12. According to NCMEC's website, CyberTipline is operated in partnership with the FBI, ICE, U.S. Postal Inspection

5

Service, U.S. Secret Service, military criminal investigative
organizations, U.S. Department of Justice, Internet Crimes
Against Children Task Force program, as well as other state and
local law enforcement agencies. Reports to the CyberTipline are
made by the public and ESPs. ESPs are required by law to report
apparent child pornography to law enforcement via the
CyberTipline.

**B.    Computer Technology and Child Pornography**

7.    File Storage. Computer users can choose their method
of storing files: either on a computer's hard drive, an external
hard drive, a memory card, a USB thumb drive, a smart phone or
other digital media device, etc. (i.e., "locally") or on virtual
servers accessible from any digital device with an Internet
connection (i.e., "cloud storage"). Computer users frequently
transfer files from one location to another, such as from a
phone to a computer or from cloud storage to an external hard
drive. Computer users also often create "backup," or duplicate,
copies of their files. Even if the actual child pornography
files are stored on a "cloud," files stored in this manner can
only be accessed via a digital device.

8.    IP Addresses. An IP Address is a unique numeric
address used to connect to the Internet. An IPv4 IP Address is
a series of four numbers, each in the range 0-255, separated by
periods (e.g., 121.56.97.178). In simple terms, one computer in
a home may connect directly to the Internet with an IP Address
assigned by an ISP. What is now more typical is that one home

Case 2:21-cr-00340-DSF Document 1 Filed 06/22/21 Page 78 of 101 Page ID #:87
40  Page ID #:87
Case 2:21-mj-00057-DUTY *SEALED*  Document 1 *SEALED*  Filed 01/06/21  Page 17 of 40
Page ID #:17

may connect to the Internet using multiple digital devices
simultaneously, including laptops, tablets, smart phones, smart
televisions, and gaming systems, by way of example.  A digital
device, such as a smart phone, may also connect to the internet
through their cellular provider rather than a home ISP.  Because
the home subscriber typically only has one Internet connection
and is only assigned one IP Address at a time by their ISP,
multiple devices in a home are connected to the Internet via a
router or hub.  Internet activity from every device attached to
the router or hub is utilizing the same external IP Address
assigned by the ISP.  The router or hub "routes" Internet
traffic so that it reaches the proper device.  Most ISPs control
a range of IP Addresses.  The IP Address for a user may be
relatively static, meaning it is assigned to the same subscriber
for long periods of time, or dynamic, meaning that the IP
Address is only assigned for the duration of that online
session.  Most ISPs maintain records of which subscriber was
assigned which IP Address during an online session.

　　　　9.  With additional records from an ISP and/or an internet
electronic service provider, such as Facebook, an IP Address can
sometimes be used to either discover the physical location of
the router used to log in to a particular account offered by an
online electronic service provider, or may identify the specific
digital device connected to that internet electronic service
provider.

　　　　13.  IP Address – IPv6.  Due to the limited number of
available IPv4 IP addresses, a new protocol was established

using the hexadecimal system to increase the number of unique IP
addresses. An IPv6 consists of eight sets of combination of
four numbers 0-9 and/or letters A through F. An example of an
IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

### V.    STATEMENT OF PROBABLE CAUSE

14.    I obtained the following information from my review of
NCMEC CT Reports, information provided to NCMEC by the PROVIDER,
and information found from publicly available and law
enforcement databases. Additionally, I have spoken with other
HSI Special Agents who have knowledge of this case and have read
their investigative notes.

### A.    IDENTIFICATION OF THE ACCOUNTS

#### 1.    ACCOUNT 1

15.    On or about July 16, 2020 at approximately 16:55:07
UTC, NCMEC received a tip, CT Report 74826265, from the PROVIDER
reporting that four files containing and/or associated with
suspected CSAM were uploaded by an individual into ACCOUNT 1.
The PROVIDER provided NCMEC with basic subscriber information
for ACCOUNT 1.

16.    According to the PROVIDER, the subscriber of ACCOUNT 1
is "Bill Frederic," with phone numbers +1 (424) 254-8657,
verified[2] on February 02, 2018 at 00:41:50 UTC, and +1 (310) 893-
0829, verified on November 04, 2017 at 17:33:27 UTC, and backup
email address as wil_90032@yahoo.com. The PROVIDER further

---

[2] According to the PROVIDER, phone number(s) are provided by
the account holder. "Verified" indicates the account holder
responded to a text sent to the phone number provided by the
user.

indicated that the date of birth listed in ACCOUNT 1's YouTube account was June 04, 1970.

17. Of the four files associated with CT 74826265, which were previously viewed by the PROVIDER and NCMEC, one was an image of a United States of America ("USA") passport, passport number 507047597, belonging to Billy Edward Frederick, date of birth ("DOB") June 04, 1970.

18. Law enforcement record checks yielded a California driver's license, driver's license number C6612174, for Billy Edward Frederick, DOB June 04, 1970, residing at the SUBJECT RESIDENCE. The photograph of the individual on the driver's license matched the individual photographed in the aforementioned USA passport.

19. Further records from Google Payment Corp show that ACCOUNT 1 listed several addresses, including the SUBJECT RESIDENCE, under the name Bill FREDERICK in the account's Google Wallet.

2. ACCOUNT 2

20. On or about July 16, 2020, at approximately 23:28:50 UTC, NCMEC received a tip, CT 74835535, from the PROVIDER reporting that 20 files containing and/or associated with CSAM were uploaded by an individual onto ACCOUNT 2. Again, on or about July 17, 2020 at approximately 07:56:21 UTC, NCMEC received a tip, CT 74843878, from the PROVIDER reporting that four files containing and/or associated with suspected CSAM were uploaded by an individual onto ACCOUNT 2. The PROVIDER provided NCMEC with basic subscriber information for ACCOUNT 2.

9

21. According to the PROVIDER, the subscriber of ACCOUNT 2 is Bill Frederick with phone numbers +1 (310) 991-8736, verified on September 12, 2014 at 07:27:01 UTC, and +1 (310) 893-0829, verified on August 01, 2017 at 23:00:05 UTC, and backup email address as wil_90032@yahoo.com.

22. Further records from Google Payment Corp show that ACCOUNT 2 listed several addresses, including the SUBJECT RESIDENCE, under the name Bill FREDERICK in the account's Google Wallet.

**B. DESCRIPTION OF IMAGES UPLOADED ONTO THE ACCOUNTS**

1. First Report - CT 74826265

23. In the first report, the PROVIDER indicated that four files containing or associated with CSAM were uploaded into ACCOUNT 1. The PROVIDER and NCMEC both stated that they viewed the four files. I have also reviewed the four files. The following are descriptions of the files that depict suspected child pornography as defined in 18 U.S.C. § 2256:

a. An image titled[3] "report_4727165610481986737" depicts what appears to be a pubescent male, approximately 14-17 years old. The male does not have a shirt or pants on, and his blue underwear is pulled down, exposing his erect penis. The subject's face is captured in the image.

b. A video titled "Google-CT-RPT-88c200116755c7d43fd0ae89546078cf" is approximately 2 minute 20

_____

[3] The title is the filename provided on the NCMEC CT Reports and associated with the actual files provided to law enforcement by NCMEC.

second video in length and depicts what appears to be four pubescent male minors, approximately 14-17 years old, naked in a bathroom. The four males appear to be recording themselves rubbing his own penis and ejaculating towards the recording device.

   c. A video titled "Google-CT-RPT-20461b891f01153064f326f603b83286" is approximately 2 minute and 1 second in length and depicts what appears to be a naked male pubescent minor, approximately 13-16 years old, recording himself rubbing his penis. At approximately 1 minute and 5 seconds, the male spreads his buttock in front of the recording device and shows his anus. He then continues to rub his penis.

   2. Second Report - CT 74835535

  24. In the second report, the PROVIDER indicated that 20 files containing or associated with CSAM were uploaded into ACCOUNT 2. The PROVIDER and NCMEC both stated that they viewed the 19 of the 20 files. I have reviewed the 19 viewed files. The following are descriptions of eight files that depict suspected child pornography as defined in 18 U.S.C. § 2256:

   a. An image titled "report_14770316951220625384" depicts what appears to be a minor's face with his (or her) eyes closed and tongue in close proximity to what appears to be a minor's penis.

   b. An image titled "Google-CT-RPT-81ddb8f92d3c6e9268285316af40523aconversation_123353895_1519973343030.jpg" depicts what appears to be a minor's penis. The pubic

region makes up the entire image and the penis is the focal point of the image. The subject's face is not in the image.

c.  An image titled "report_112138815470731704 91" displays two naked bodies from the mid/lower torsos to mid thighs. The image depicts what appears to be two minor penises with the penises as the center focal point of the image. The subjects' faces are not in the image.

d.  An image titled "report_16746517745513618091" depicts what appears to be a minor's penis as the center focal point of the image. The body is wearing a white shirt and is not clothes from the waist down. The subjects face is not in the image.

e.  An image titled "report_15051623118090402593" depicts a naked body from just below the belly button to the midthigh. The image depicts what appears to be a minor's penis as the center focal point of the image. The subject's face is not in the image.

f.  An image titled "Google-CT-RPT-813c7206750a449f84771291dc73a349-download_20190402_170336.jpg" depicts what appears to be a naked minor male holding a white sign that says, "WISH YOU CAN GIVE ME 3,000 PESOS FOR I BUY LOTS OF FOOD (and sign) TOY'S (heart) CEDRICK". The sign covers the subject's face and torso and the subject's belly button, penis and bare thighs are included in the image.

g.  An image "Google-CT-RPT-edd7d5319c6905f204653ff38d9ee8b7-1559626950337.jpg" depicts an adult subject laying with what appears to be a prepubescent

12

minor male, approximately 5-7 years old. The minor is wearing a yellow and blue tank top that is pushed up to his upper torso. The minor is not wearing bottoms. The minor's legs are spread open and his penis is captured in the image. The adult's hand is located near the minor's pubic region, on the inner upper thigh region of the minor's leg.

      h. An image "Google-CT-RPT-cbfcbb17f6aa74104efc6f9f1bb6591cdownload_20190605_111312.jpg" depicts what appears to a naked male minor, approximately 7-11 years old, sitting on a light blue tile floor with his legs spread opened. The minor's face, penis and anus are captured in the image.

      3. <u>Third Report - CT 74843878</u>

25. In the third report, the PROVIDER indicated that four files containing or associated with CSAM were uploaded into ACCOUNT 2. The PROVIDER and NCMEC both stated that they viewed the four files. I have reviewed the four files. The following are descriptions of three files that depict suspected child pornography as defined in 18 U.S.C. § 2256:

      a. A gif titled "Google-CT-RPT-e5ba8561bb1374363afc31677e03a5b0-178187036395_6.gif" depicts what appears to be a naked minor male attempting to penetrate the anus of an unknown aged male.

      b. An image titled "Google-CT-RPT-5064fc25a6fb66ca4d53ab2407c56a83-103271932981_0.jpg" depicts what appears to be a prepubescent penis with the penis as the

Case 2:21-cr-00340-DSF Document 1 Filed 06/22/21 Page 85 of 101 Page ID #:94
40  Page ID #:94
Case 2:21-mj-00057-DUTY *SEALED*  Document 1 *SEALED*  Filed 01/06/21  Page 24 of 40
Page ID #:24

focal point of the image.  The subject's face or body are not in the image.

      c.    An image titled "report_14658182637924933274" depicts a naked adult male holding the top of a what appears to be a minor's head and the subject is eye level with the adult male's erect penis.  The adult male's erect penis is on the face of the subject.

    26.   Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the ACCOUNTS by other means.

## VI. BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDERS

    27.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the ACCOUNTS. Subscribers obtain an account by registering with a PROVIDER. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other

e-mail addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

28. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDERS' services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an ACCOUNT.

29. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

30. In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or

15

closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail and social media providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the ACCOUNTS.

31. In my training and experience, e-mail and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of e-mails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the ACCOUNTS.

32. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by

16

multiple people.  Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of the ACCOUNTS, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the ACCOUNTS with the date restriction included in Attachment B for review by the search team.

33.  Relatedly, the government must be allowed to determine whether other individuals had access the ACCOUNTS.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

17

Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 06/22/21 Page 89 of 101 Page ID #:98
40 Page ID #:98
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 28 of 40
Page ID #:28

34. In my training and experience, providers also keep a record of search queries run by the user of the account, whether searches within the services of the provider for persons, content, or other accounts (such as if a user is trying to find the account of an acquaintance), or broader Internet searches. In some instances, providers may also keep records of which websites or contents were "clicked on" as a result of these searches. This information is helpful in the context of the case to show the topics about which the user was trying to obtain more information or conduct research, and is relevant for "user attribution" evidence, analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

35. I also know based on my training and experience that providers of e-mail or social media services generally have access to and store the web or Internet browsing history of the user while he or she is logged into an account. That history can include the names and specific websites or URLs/URIs (Uniform Resource Locators or Indicators) of the sites that have been visited.

36. Users of accounts are often required to include an e-mail account as well as a phone number in subscriber records. The e-mail account may be an e-mail account hosted at the same provider, or an account at a different provider. The e-mail account is referred to by a number of names, such as a secondary e-mail account, a recovery e-mail account, or an alternative e-mail account or communication channel. That e-mail account is often used when the identity of the user of the primary account

18

(here, an ACCOUNT) needs to be verified, for example if a password is forgotten, so that the provider can confirm that the person trying to access the account is the authorized user of the account.  Similarly, the telephone number used in subscriber records is often used to send a passcode via text (or "SMS") that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second).  In either scenario, the user of a primary e-mail account (an ACCOUNT) and a secondary e-mail account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary e-mail account or to the phone number listed in subscriber records can allow access to the primary account.

37.  Providers also frequently obtain information about the types of devices that are used to access accounts like the ACCOUNTS.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices.  Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep track of the

19

devices using its services. Those device identifiers include Android IDs, Advertising IDs, unique application numbers, hardware models, operating system versions, unique device identifiers, Global Unique Identifiers or "GUIDs," serial numbers, mobile network information, phone numbers, device serial numbers, Media Access Control ("MAC") addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"). Apple, one of the primary suppliers of mobile devices used to access accounts like the ACCOUNTS, had previously used an identifier that was unique to the hardware of its devices, such that details of a device's activity obtained from a particular application or "app" could be used to target advertisements for the user of that device. Apple replaced that hardware-based identifier with the Apple advertiser ID or IDFA that is still unique to a particular device, but which can be wiped and re-generated anew by a user if a user chooses to do so. Most users, however, do not know that the IDFA exists, and therefore are unaware that their device's activity can be correlated across different apps or services. Google uses a similar advertiser ID referred to as an AAID.

38. These device identifiers can then be used (a) to identify accounts accessed at other providers by that same

device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access the ACCOUNTs. The requested warrant therefore asks for the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

39. Providers of e-mail and social media often maintain, have access to, and store information related to the location of the users of accounts they service. That information may be obtained by the provider in a number of ways. For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information. It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

40. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. They can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a

Case 2:21-cr-00300-DSF Document 1 Filed 06/22/21 Page 93 of 101 Page ID #:102
40 Page ID #:102
Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 32 of 40
Page ID #:32

message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters. "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B is necessary to find all relevant
evidence within the account.

41. This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER have chosen to store such
information.

42. As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case
is completed through disposition, trial, appeal, or collateral
proceeding.

a. I make that request because I believe it might be
impossible for a provider to authenticate information taken from
the ACCOUNTS as its business record without the original
production to examine. Even if the provider kept an original
copy at the time of production (against which it could compare
against the results of the search at the time of trial), the
government cannot compel the provider to keep a copy for the

entire pendency of the investigation and/or case.  If the
original production is destroyed, it may be impossible for the
provider to examine a particular document found by the search
team and confirm that it was a business record of the provider
taken from the ACCOUNTS.

       b.   I also know from my training and experience that
many accounts are purged as part of the ordinary course of
business by providers.  For example, if an account is not
accessed within a specified time period, it -- and its contents
-- may be deleted.  As a consequence, there is a risk that the
only record of the contents of an account might be the
production that a provider makes to the government, for example,
if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its *Brady*
obligations and give the defendant access to evidence that might
be used in his or her defense.

### VII.  SERVICES PROVIDED BY GOOGLE LLC

    43.   I believe that the ACCOUNTS use the following Google
LLC services, potentially among others: Gmail, Google Photos,
Google Calendar, Google Hangsouts, Google Payments, Location
History, Web, & App Activity, and YouTube.

    44.   In my training and experience, I have learned that
Google provides a variety of online services, including e-mail,
document storage, mobile operating systems, translation
services, software coding tools, malware analysis, social media
accounts, applications development tools, video and photograph

Case 2:21-mj-00057-DUTY *SEALED*   Document 1 *SEALED*   Filed 01/06/21   Page 34 of 40
Page ID #:34

sharing and storage, web feed management tools, personalized
home pages, news aggregation tools, a Google account "dashboard"
tool, an online retail storefront offering applications for free
and for sale, website analytic tools, calendars, web browsers,
mapping tools, location tracking tools, and telephone and
voicemail transcription to the public.

45.   Google offers numerous services which enhance the
user's Internet experience, including Google Dashboard, Google
Reader, Google News, and Google Groups.  Google News and the
now-discontinued Google Reader are website feed aggregators that
allowed a user to view website articles and news in one
centralized location.  Google Groups are e-mail groups whereby
one person can send an e-mail to an e-mail address that serves
as the "group," and the message or e-mail is either or both
posted to a centralized location and/or sent to everyone who is
currently subscribed to the group via e-mail; each group is
generally set up using a Google account.

46.   Evidence of who it is that a user of an e-mail or
social media account had contacted and for what purpose can also
reside in the information likely stored on the ACCOUNTS at
Google.  For example, photographs can be stored not only as
attachments to e-mails, but they can be linked to a particular
contact stored in connection with an e-mail account, they can be
stored in connection with a particular "friend" or event on a
Google+ account, or they can be stored in a Google Photos
(formerly Picasa) web album.  Albums can be compiled for a
particular trip or occasion, documenting who was present, when

it took place, and where it was -- for example by recovering location information that is sometimes stored in metadata or what is referred to as "EXIF data" on digital photographs. Likewise, personal videos can be uploaded to or downloaded from video services such as Google's YouTube.  All of this data can assist in identifying the true identity of the account user and persons with whom the user of the account has been in contact.

47.  Aside from photos, Google+, Google Plusone, and the discontinued iGoogle are social networking services similar to Facebook.  Data residing on Google+, Google Plusone, and iGoogle accounts is likely to provide information regarding the true identity of the person(s) using the ACCOUNTS, the identities of persons with whom the user of the ACCOUNTS has been in contact, the nature of those contacts, and whether any such contacts were related to the subject matter of the investigation described above.  Furthermore, a user's history that relates to web browsing, web searches, and certain activity related to Google services or applications (or "apps") are stored in an account's Google History, or Google Web & App Activity.

48.  In addition to storing photographs, calendars, and other evidence related to social media, a subscriber can also sign up for other services at Google, such as Google Drive and Google Docs, which allow users to store any kind of documents.

49.  Further, Google Maps provides a mapping tool that allows users to save locations, such as their home and work locations, create custom maps, make changes and edits to public places, "star" locations, and create private labels for

Case 2:21-mj-00057-DUTY *SEALED* Document 1 *SEALED* Filed 01/06/21 Page 36 of 40 Page ID #:36

locations. Google Location History provides Global Positioning System (GPS) location information. All of these services can be used to identify where an individual is and has been physically located. Google also in some instances maintains records of the nearby wireless or "Wi-Fi" access points (that can be used to connect to the Internet) or the cell towers connected to a device that is accessing a Google account.

50. Google offers services which interpret and translate text, including Google Translate (which allow users to paste text in one language that will be translated into another) and Google Translator Toolkit (which includes more functionality and collaboration), which can translate text in 345 source languages into 345 target languages. The translation service is Internet-based, so it can be used by the user of an account to translate e-mails received as well as websites visited.

51. Over the last several years, Google has developed a number of mobile telephone technologies, including the development of the Android mobile operating system, Android Market, and Google Talk. The Android operating system is used on the majority of the world's touch-screen mobile devices and smartphones, and facilitates the downloading and running of games and applications, sending of text and voice messages, connecting to and searching the Internet, and providing of GPS and location services, camera services for the taking of photographs and videos (including video calling), clock and calendar services, and e-mail services, and storing of contact lists and documents. The Google Play service provides the

26

virtual storefront at which applications can be downloaded and updated.  Google Talk is an instant messaging service that provides both text and voice communication.  I know from experience that Android applications including these are generally downloaded from the Android Market and Google Play services.

52.  Google also uses "unique application numbers," which Google uses to record information such as the operating system type and the application version number used to access Google by a particular device.  Google maintains these unique application numbers to track and collect information related to a particular device accessing Google services, which is recognized when updating Google services or software on a device using a Google account.

53.  Google offers a service called Google Hangouts, which allows Google users to communicate by means of video calls, phone or audio calls, or written messages.

54.  Google also offers its own web browser, a program called Google Chrome, which can be used instead of other web browsers such as Microsoft Internet Explorer or Mozilla Firefox.  Users who have a Google account can use Google Chrome on multiple devices, and can decide which information "syncs" or synchronizes across multiple devices that are running Google Chrome.  Devices that can be synced include computers, Google's own computers called Chromebooks, devices running Google's own Android operating system, or iPhones or iPads (devices made by Apple, Inc. that use Apple's proprietary operating system).

Users have the option to sync all data across multiple devices, or only certain information by checking certain boxes, and can choose to require a passphrase to sync between different computers as well as to encrypt any passwords stored by Google Chrome.

55.   Depending on whether a user of a Google account implemented Google's two-factor authentication system (which can require the user to enter both a user-name and password and a code sent to one's cell phone), Google may also have authentication logs of when the user successfully authenticated or identified him- or herself when logging into an account. Similarly, for certain mobile devices, a password for the specific "app" installed on the mobile device may be generated and used to maintain access.

56.   For this reason, Attachment B in the requested warrant to Google requires Google to provide information related to any Google service used by a the ACCOUNTS, as the user/s of the ACCOUNTS may have enrolled in new services since the subscriber records were provided to NCMEC from Google.

## VIII.    <u>REQUEST FOR NON-DISCLOSURE</u>

57.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDERS not to notify any person, including the subscriber(s) of the ACCOUNTS, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from

28

the date the requested warrant is signed by the magistrate judge,
or such later date as may be set by the Court upon application
for an extension by the United States.  There is reason to
believe that such notification will result in: (1) flight from
prosecution; (2) destruction of or tampering with evidence;
(3) intimidation of potential witnesses; (4) otherwise seriously
jeopardizing the investigation; or (6) unduly delaying trial.
The current investigation set forth above is not public, and I
know, based on my training and experience, those who send
contraband digital files often will destroy digital evidence if
the target/s learn(s) of an investigation.  In addition, if the
PROVIDER or other person notifies the targets of the
investigation that a warrant has been issued for the ACCOUNTS,
the unidentified target/s might further mask their activity and
seriously jeopardize the investigation.

## IX.  CONCLUSION

58.  Based on the foregoing, I request that the Court issue
the requested warrant.  For the reasons described above, I
respectfully submit there is probable cause to believe that
evidence, fruits, and instrumentalities of the SUBJECT OFFENSES
will be found in the ACCOUNTS.

95. The government will execute these warrant by serving these warrants on the PROVIDER. Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>6th</u> day of January, 2021.

HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE