E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KATHY YU (Cal. Bar No. 268210)
Assistant United States Attorneys
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2431
    E-mail:  kathy.yu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>BILLY EDWARD FREDERICK,<br>   aka "A4SBILL@GMAIL.COM," and<br>    "BILLME@GMAIL.COM"<br><br>      Defendant. | No. CR 21-340-DSF<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT BILLY EDWARD FREDERICK<br><br>[Exhibits Filed Concurrently Under Seal]<br><br>**SENTENCING DATE:**<br>October 24, 2022 at 10 A.M. |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Kathy Yu, hereby files its sentencing position for defendant Billy Edward Frederick ("defendant").

    The government's sentencing position is based upon the attached memorandum of points and authorities, the concurrently filed exhibits (under seal), the files and records in this case, the Presentence Investigation Report, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

1

1    The government expects to file a supplemental responsive brief,

2  no later than October 3, 2022 in accordance with the Court's Order

3  Setting schedule for Filing of Sentencing Pleadings (Dkt. No. 56).

4   Dated: September 19, 2022        Respectfully submitted,

5                                    E. MARTIN ESTRADA
                                     United States Attorney
6
                                     SCOTT M. GARRINGER
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9                                    _____/s/_____
                                     KATHY YU
10                                   Assistant United States Attorney

11                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION..................................................1

II.   DEFENDANT'S CONDUCT...........................................1

III.  GUIDELINES CALCULATION........................................4

IV.   THE GOVERNMENT'S RECOMMENDATION OF LIFE IS SUPPORTED BY THE
      3553 FACTORS..................................................5

      A.    A Life Sentence is Sufficient But Not Greater Than
            Necessary...............................................6

            1.    Defendant Had a Set Modus Operandi in Targeting
                  Philippine Boys...................................6

            2.    Defendant's Penchant for Incestuous Child Sex
                  Abuse Material Created a Market for Vulnerable
                  Victims...........................................8

            3.    Defendant Flouted His Economic Stability and
                  Advanced Degree...................................9

            4.    Defendant's Sophistication and Successful
                  Attempts to Evade Law Enforcement Are Aggravating....9

            5.    Defendant's Actions Have Had, and Will Have,
                  Lasting Damage on His Victims....................11

      B.    A Lifetime Period of Supervised Release Should be
            Imposed................................................13

      C.    Restitution, Special Assessments, and Fine.............13

            1.    Defendant's Financial Condition and Ability to
                  Pay..............................................13

            2.    Restitution......................................15

            3.    Special Assessments and Fine.....................15

V.    CONCLUSION...................................................16

iii

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

**I.    INTRODUCTION**

Exploiting his relative wealth, education, and status over his victims – poor, young boys in the Philippines in need of money for food and school – defendant Billy Edward Frederick created over 5,000 images and videos of child sex abuse material of at least 35 Philippine children.  Defendant's conversations, never intended to be seen by anyone else, reveal his long-standing sexual interest in young boys, his insatiable appetite for incestuous child sex abuse material, his sophistication in evading law enforcement, the arrogance with which he committed these offenses, and his lack of respect for the law:  all underscoring the need for the life sentence requested by the government.

Based on the facts of this case, the government recommends a sentence of life (to consist of 30 years of Count 1 and life on Count 2 of the Information, to be served concurrently), a lifetime period of supervised release, and requests that the Court enter the agreed-upon restitution of $8,000 to Victim #1 (Dkt. No. 58), and impose special assessments of $10,200 total ($10,000 under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, and $200 under 18 U.S.C. § 3013).

**II.   DEFENDANT'S CONDUCT**

As set forth in the plea agreement (Dkt. No. 26 (the "Plea Agreement")), defendant admitted the following facts:

From a date unknown and continuing through at least July 2020, defendant employed, used, persuaded, induced, enticed, and coerced various victims in the Philippines – all under 18 years old – to

engage in sexually explicit conduct outside of the United States for the purpose of producing a visual depiction of such conduct, and intending that the visual depiction would be transported to him in the United States.  During this time period, defendant also used the Internet, Google Hangouts, and Google Chats, to knowingly persuade, induce, entice, and coerce, using undue influence, these victims in the Philippines – all under 18 years old – to engage in any sexual activity for which someone could be charged with an offense, including Oral Copulation with a Minor, a violation of California Penal Code Section 287(b)(1); and Sodomy with a Minor, a violation of California Penal Code Section 286(b)(1).

For example, beginning on a date unknown and continuing to at least July 2020, defendant paid Victim #1 for child sex abuse material.  On or about July 9, 2020, Victim #1 asked to borrow "2000 pls [please]," so that he could buy "boxer short and brief," to which defendant instructed him, "[d]ont wear underwear."  Within an hour of the initiation of that conversation, defendant told Victim #1, "[s]how me your underwear."  Thereafter, Victim #1 sent various images to defendant, including the following: (1) an image depicting Victim #1 naked, kneeling on the bed with prayer-like hands near his mouth (as if begging for money) with his penis exposed (except for the tip); (2) an image depicting Victim #1's erect penis; and (3) an image depicting Victim #1's belly button and penis.  In response, defendant told Victim #1 that Victim #1 "ha[s] a big dick now" and "it's grown so much in a few years."

During this same time period, defendant, using the Internet, Google Hangouts, and Google Chats, also knowingly persuaded, induced,

enticed, and coerced Victim #1 (who was located in the Philippines) to engage in oral copulation with other minors, and sodomy with other minors.  For example, on or about April 27, 2018, in response to Victim #1 saying he needed money for a summer sports clinic, defendant said, "I want to watch you get fucked again," and "[y]ou need dick in your butt and mouth again."  In response, on or about May 5, 2018, Victim #1 apologized for the quality of child sex abuse videos he had created for defendant according to defendant's instructions, saying "[a]bout the videos master sorry if i cant take in all the dick of my brother its very huge only the head is very hurt to my asshole."

Defendant continued to persuade, induce, entice, and coerce Victim #1, such as by telling him: on or about June 7, 2018, "I like watching guys fuck your ass, so just seeing your little dick when blurry may not be so exciting?" and "I like your little dick even though you cut it"; on or about November 8, 2019, "you should fuck your brothers"; on or about February 28, 2019, "I like your little butt.  I wish I could fuck it," "next time you ned money, you have to fuck," and "I would pay to cum in your butthole."

At a minimum, and based on the ongoing investigation to date, defendant admits he produced over 5,000 images and videos of child pornography of at least 35 different children by requesting these children engage in specified sexually explicit activity in exchange for money.  Some of the videos and images depicted minor victims under the age of 12 being used for sexual acts.

**III. GUIDELINES CALCULATION**

The government concurs with the Probation Officer, who found the following enhancements applicable to defendant's commission of the crime of production of child pornography for transportation into the United States (PSR ¶¶ 27-46).  While the parties agreed to some of these specific offense enhancements in the Plea Agreement (Plea Agreement ¶ 20), the government also specifically reserved the right to argue for the application of additional enhancements.  For ease of reference, the government has bolded only the contested offense characteristics.

| | | |
|---|---|---|
| Base Offense Level: | 32 | U.S.S.G. § 2G2.1(a) |
| Minor Under 12 | +4 | U.S.S.G. § 2G2.1(b)(1) |
| Sexual Act/Contact | +2 | U.S.S.G. § 2G2.1(b)(2)(A) |
| ***Distribution*** | ***+2*** | ***U.S.S.G. § 2G2.1(b)(3)*** |
| ***Sadistic or masochistic conduct*** | ***+4*** | ***U.S.S.G. § 2G2.1(b)(4)*** |
| Use of Computer or Interactive Computer Service | +2 | U.S.S.G. § 2G2.1(b)(6)(B) |
| ***Vulnerable victim*** | ***+2*** | ***U.S.S.G. § 3A1.1(b)(1)*** |
| ***Pattern of prohibited sexual conduct*** | ***+4*** | ***U.S.S.G. § 4B1.5*** |
| Offense level before acceptance | 53 | |

The Court only needs to find the facts supporting a specific offense characteristic by a preponderance-of-the-evidence standard because the enhancement will not have "an extremely disproportionate effect on [defendant's] sentence."  United States v. Pike, 473 F.3d 1053, 1058-59 (9th Cir. 2007) (applying a preponderance-of-the-evidence standard to a five-level enhancement).  It means that the Court "must be persuaded by the evidence that the claim is more

4

probably true than not true."  Ninth Circuit Model Civil Jury Instruction 1.6 (Burden of Proof – Preponderance of the Evidence). However, even under a higher standard, such as clear and convincing, the specific offense characteristics at issue here – distribution, sadistic or masochistic conduct, vulnerable victim, and pattern of prohibited sexual conduct – would be met by the facts set forth in the PSR, with which the government concurs.  (PSR ¶¶ 32-35, 38-39; 43-46.)

With the incorporation of the applicable enhancements and adjustments, the government agrees with the Probation Officer, who concluded the total offense level is 53.  (PSR ¶ 46.)  With a three-level decrease for acceptance of responsibility, the adjusted offense level is 50.  (PSR ¶¶ 47-48.)  However, because the Sentencing Table ends at 43, "in those rare instances when the total offense level is calculated in excess of 43," the offense level will be treated as level 43 under Chapter 5, Part A comment n.2.  (PSR ¶ 49.)

With a criminal history category of I (PSR ¶ 55), with which the government concurs, the Guidelines range is life.

**IV.  THE GOVERNMENT'S RECOMMENDATION OF LIFE IS SUPPORTED BY THE 3553 FACTORS**

Based on the facts of this case, the government recommends a sentence of life (to consist of 30 years of Count 1 and life on Count 2 of the Information, to be served concurrently), a lifetime period of supervised release, and requests that the Court enter the agreed-upon restitution of $8,000 to Victim #1 (Dkt. No. 58), and impose special assessments of $10,200 total ($10,000 under the Amy, Vicky,

5

and Andy Child Pornography Victim Assistance Act of 2018, and $200 under 18 U.S.C. § 3013).

### A.   A Life Sentence is Sufficient But Not Greater Than Necessary

Defendant permanently damaged numerous children.  As defendant admits, he exploited "at least 35 different children" and "produced over 5,000 images and videos" of child sex abuse material.  (Plea Agreement at ¶ 18.)  Those children will never recover.

For the purposes of sentencing, the government includes only a fraction of the conversations[1] between defendant and his victims – which reflect on the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

### 1.   Defendant Had a Set Modus Operandi in Targeting Philippine Boys

Using Google chat to bridge their geographical divide, defendant, while living in Los Angeles County, exploited numerous boys who lived in the Philippines.  Defendant's years-long conversations with these Philippine boys were not coded; they were explicit and lurid – brimming with details regarding what defendant liked, demanded, and expected from his victims, should they wish to be paid.  (Exs. A-E.)  And the victims complied because, as defendant

[1] Due to technological constraints, the chats, set forth in Exhibits A through F, begin with the most recent exchange. Therefore, the start of the conversation begins on the last page of each exhibit (not the first).  Also, the images have been separated from the chats and the government has provided descriptions instead. Should the Court require examination of any of the images (including the CSAM images produced and/or received by defendant), the government will make them available at the sentencing hearing.

knew, they were desperate for money to pay for basic necessities such as food, school, clothing, and medicine.

Defendant's abuse of Philippine boys was so prolonged and extensive that he had set rules of engagement.  For example, at the outset of any arrangement, defendant required the boys to upload sample photos to defendant's private link, including photos of the child, and the inside and outside of the child's home.  (Ex. B at 17-18; Ex. C at 4.)  Defendant's screening process also required the boys to send photographs of their body to see if they met the defendant's specifications.  Among other things, defendant demanded photographs of the victim's penis ("soft and hard separately"); and photographs of the victim's face and body ("full size" "photos" "that show your face and your naked body otherwise it's not really that interesting to me").  (Ex. C at 3.)

As defendant explained, use of his private link would allow him to determine "what city" the child was in, and "help[ed him] to understand" that his victim was "a real boy."  (Ex. B at 17.)  Defendant also explained his "rules," including that the boys were not to "lie" to him or "be manipulative," and were not to "do anything until" he told them he had "money ready" for them.  (Ex. B at 17; Ex. C at 4.)  Defendant had general rates for what he was willing to pay; he told his victims he would pay them about "$1.4 photo" and "$15 per minute video" but he would "use [his] own discretion because it's just a guide."  (Ex. B at 17.)  Defendant's payment depended on "how much" he liked the materials and if it "ma[d]e [his] dick hard."  (Ex. C at 3.)  Defendant also took the time to explain to his victims the sexual acts for which he would pay

7

1  top dollar:  he professed his "love [for] skinny young boys that have

2  no hair and any size dick" as well as "young boys fuck[ing]" and

3  "brother sex." (Ex. C at 3.)

4          2.   Defendant's Penchant for Incestuous Child Sex Abuse
               Material Created a Market for Vulnerable Victims

5

6       As defendant explained to many victims, he particularly enjoyed

7  videos depicting young boys engaged in sexual acts – specifically of

8  brothers – another aggravating fact warranting the life sentence

9  requested by the government.  (Ex. C at 3; Ex. A at 7 ("I want you to

10  fuck your brother") id. at 17 ("Show your brother your dick"); id. at

11  19 ("Nice skinny body.  You should fuck your brothers."); Ex. B at 11

12  ("I prefer if at least one is younger like your brother"); id. ("I

13  want brothers at least one small dick."); id. at 13 ("Do you think

14  you could fuck your brother?"); id. at 14 ("I liked your little

15  brother because his dick was so small").)

16       For example, on or about August 13, 2019, defendant told a

17  victim he would give him money for food, that it was "sent," and

18  provided explicit instructions on what the victim had to do had to

19  do:  "You have to FUCK" and "Do you like to fuck your family?"  (Ex.

20  D at 19.)  Less than two weeks later, on August 25, 2019, defendant

21  gave further detailed instructions on the types of sexual acts he

22  expected this victim to perform.  (Ex. D at 17.)  Defendant then

23  appeared to confirm payment, saying "sent," "do your job babe," and

24  "be careful no one else finds out."  Two days later, on August 27,

25  2019, this victim confirmed it was done, saying "just save 6 files to

26  your dropbox."  Unsatisfied with having produced incestuous child sex

27  abuse material and for further sexual gratification, defendant then

28

forced this victim to recount the details of the incest – telling the victim what to say and pointers on how to make future videos to his liking.  (Ex. D at 14-15; id. at 15 ("You should talk on the video so I know everyone's name").)

### 3.   Defendant Flouted His Economic Stability and Advanced Degree

Defendant also lorded his economic and educational status over his victims, whom they called "master," all the while referring to themselves as his slaves.  (Ex. A (victim calling defendant "master" over 500 times); Ex. D (victim calling defendant "master" over 300 times); Ex. B (victim calling defendant "master" over 90 times); Ex. E (victim calling defendant "master" over 30 times).)  While defendant at times told his victims he did not have money to pay them, he also frequently bragged that he had a "Master's degree from a U.S. University" so he "ma[d]e a little more" money than people did in the Philippines, demonstrating the hubris with which he committed the instant offenses.  (Ex. A at 9; Ex. B at 3 ("I am 49 years old, live in the U.S. and have a Master's Degree" and "Yes long hours full time job and 3 businesses").)

### 4.   Defendant's Sophistication and Successful Attempts to Evade Law Enforcement Are Aggravating

The sophistication with which defendant committed these child exploitation crimes also warrants the requested life sentence.

First, taking advantage of the anonymity associated with cryptocurrency, defendant instructed his victims to set up an account using Bitcoin, such as through "coins.ph" so the transactions would be harder to trace.  Defendant admitted to his victims he had used

Western Union in the past, but because he had "used them too much over the years," his accounts had been shut down. (Ex. C at 4; Ex. E at 16.) Undeterred, defendant then turned to, and escalated to using, cryptocurrency to facilitate payments to Philippine boys in exchange for child sex abuse material.

Second, defendant's conversation with his Philippine adult facilitators also reveal the lengths he went to evade law enforcement detection and his lack of respect for the law. (Ex. F.) For example, in July 2020, an adult facilitator in the Philippines sent defendant pages from a document entitled "Anti Trafficking in Person," issued by the Republic of the Philippines, Department of Justice, Office of the City Prosecutor. (Ex. F at 11; 50-55.) The adult facilitators helping defendant obtain children appeared to be the subject of an ongoing investigation, and one of them asked defendant to "pls explain [the document]." (Ex. F at 11.) In response, defendant promised that if they found an attorney to represent the adult facilitators, he would "pay." (Id. at 10.) Defendant further opined that "a claim from an 8 year old boy from 9 months ago is hard to sustain." (Id. at 9.) Defendant demonstrated his knowledge of evading law enforcement – honed over his years of abuse of Philippine children without detection – and instructed his Philippine counterparts to "[c]over your tattoos in case they were in a photo," and "[i]f you have a tattoo then it's hard to claim it wasn't you." (Id. at 8.) As repayment for the funds defendant provided for them to hire a lawyer, the adult facilitators promised defendant that when the remaining victims were done with their "travel," they would "need to repay of u by the[ir] naked photos."

1  (Ex. F at 6; id. ("also I told them to make naked photos of them in
2  the jungle").)

3       Defendant,[2] even expressly on notice of an ongoing criminal
4  action in the Philippines relating to the very individuals he was
5  talking to, expressed no worry or remorse.  Instead, he attempted to
6  aid and abet the Philippine facilitators in their obstruction abroad
7  and extract a promise for even more child sex abuse material –
8  another aggravating fact warranting the life sentence requested by
9  the government.

10          5.   Defendant's Actions Have Had, and Will Have, Lasting
                 Damage on His Victims
11

12      While the investigation remains open and ongoing in Manila, to
13  date, the government has only been able to track down and interview
14  one of defendant's victims, referred to as Victim #1 in the factual
15  basis of the Plea Agreement.  (See supra pages 1-3.)  Unfortunately,
16  Victim #1 appeared to be one of defendant's favorites, and was
17  subjected to defendant's exploitation for at least two years.  (Ex.
18  A.)  Throughout the course of their relationship, Victim #1 (like
19  many of defendant's victims) asked defendant for money for school, a
20  sports program, clothing, and medical supplies in exchange for
21  sending naked photographs and videos.  For example, in November 2019,
22  Victim #1, all too familiar with defendant's perverse predilections,
23  asked if he could "sell" defendant "naked photos in [his] school
24  uniform" wherein he ejaculated, and then "ate [his] cum."  (Ex. A at

25  _____

26       [2] In passing, defendant and one particular facilitator also
     discussed that they had been working together since 2013,
27   demonstrating defendant's long-term exploitation of Philippine
     children, and the creation and sponsorship of a market for such.
28   (Ex. F at 41.)

                                   11

19-20.)  Victim #1 explained he needed money for "school fees" and because he was "too much hungry."  (Id.)  Victim #1 also called defendant "master" more than 15 times in this conversation alone to get his attention.  (Ex. A at 19-20.)  Indeed, defendant's victimization of this boy was so long that, in July 2020, when Victim #1 sent naked images – after they had been communicating for over two years – defendant commented on how the boy's body had changed over the years.  (Ex. A at 2 ("You have a big dick now.  It's grown so much in a few years."); Ex. A at 2 ("Your English has definitely improved."); Ex. A at 1 ("I was watching a video of you yesterday. Back when your uncut dick was tiny.").)

Unsurprisingly, when interviewed, Victim #1 would not – or could not – admit that he had talked to defendant.  He did, however, identify himself in two photographs found in defendant's possession, and said that he was 12 years old in the photographs.  (Ex. K at 00:20 – 01:45; 06:11 – 07:00.)[3]  He later explained that identifying himself in photographs and recounting the abuse made him feel "bad" about himself.  (Ex. K at 08:22 – 09:41 ("I feel bad about myself," "I feel bad about the fact that that happened when I was young," "I got to a point that, I felt so bad I don't even want to go to school because it might go public").)  Victim #1 explained that he was worried that others in his life – including his now-girlfriend – would learn about his past and "tease" him.  (Ex. K at 09:40 – 10:21.)  Victim #1 also expressed his fervent desire to try to move forward with his life and forget what had happened to him.  While

---

[3] These rough transcriptions are based on the real-time English translation provided in the video.  The approximate timestamps detailed herein reflect the minute and second marker.

Victim #1 elected not to provide a Victim Impact Statement, his deep shame and pain are unmistakable, palpable, and deeply heartbreaking in this interview.

No one should endure what Victim #1 and defendant's other victims have endured.  Only a Guidelines sentence, here, life, can reflect the severity of the offense, protect the public against this defendant, and deter other would-be offenders from exploiting children abroad for their own pleasure with reckless disregard for the lives they mar.

**B.    A Lifetime Period of Supervised Release Should be Imposed**

Given defendant's long-term and extensive abuse of numerous children, to protect the public from further crimes, and to provide defendant with any needed educational, medical care, and/or correctional treatment, the government agrees with the Probation Officer that a lifetime term of supervised release is appropriate in this particular case.  (Dkt. No. 43, Recommendation Letter, at 2.)

**C.    Restitution, Special Assessments, and Fine**

1.    Defendant's Financial Condition and Ability to Pay

Until the time of his arrest for the charged offenses, defendant was employed as a Senior Tax Accountant making $97,000 per year. (PSR ¶ 84.)  He reported two bank accounts to the Probation Officer (Caltech Credit Union and Empower Retirement).  (PSR ¶¶ 86-88.)  He reported outstanding balances from four credit cards.  (PSR ¶ 88.) Balancing defendant's reported assets with his reported liabilities, the PSR concluded that defendant's total net worth was approximately $28,000.  (PSR ¶ 88.)

From the investigation though, the government was also aware of the following additional assets[4] – which were not mentioned in the PSR.

- Defendant's account, ending in 9343, at Bank Of America had a balance of approximately $5,896.74 as of May 12, 2021. (Ex. G at 1.)

- Defendant's joint account ending in 2289, at Bank Of America had a balance of approximately -$24.00 as of May 21, 2021. (Ex. H at 1.)

- Defendant's account at Coinbase, which had a balance of approximately $39.21 as of June 11, 2021. (Ex. I at 5.)

- Defendant currently possesses a 2006 Acura TSX (which appears to be selling for around $8,490 to $12,000). (Ex. J.)

Assuming the bank account amounts stayed constant and that defendant sold the Acura TSX at the low-end of fair market value, defendant would actually have another $14,401.95 in assets. Coupled with the assets actually reported in the PSR, he would have total assets of over $46,000. Whether defendant has assets of $32,000 or $46,000 (as the government calculates based on information available

---

[4] As of this filing, the government sent the evidentiary support regarding these assets to the Probation Officer, and has requested a copy of defendant's Personal Financial Statement to better understand the status of these accounts and defendant's financial affairs. Defendant consented to allowing the government to "inspect[] and copy[] all of defendant's financial documents and financial information held by the Untied States Probation and Pretrial Services Office." (Plea Agreement at ¶ 2(i).)

The government has not yet received a copy of defendant's Personal Financial Statement, and may further revise its recommendation if it becomes aware of additional assets owned by defendant.

1    to it at this time), the government concurs with the USPO that

2    defendant certainly has an ability to pay.

3             2.    Restitution

4         As to restitution, to date, the government has requested

5    restitution on behalf of one victim, Victim #1, which the defendant

6    has agreed to pay.  (Dkt. No. 57, 58.)  The government has not

7    received any other requests, and does not anticipate receiving any

8    other requests.

9             3.    Special Assessments[5] and Fine

10        As to special assessments, defendant's convictions subject him

11   to the Amy, Vicky, and Andy Child Pornography Victim Assistance Act

12   of 2018, which allows the Court to impose (1) not more than $17,000

13   on any person convicted of an offense under 18 U.S.C. § 2252(a)(4) or

14   § 2252A(a)(5); (2) not more than $35,000 on any person convicted of

15   any other offense for trafficking in child pornography; and (3) not

16   more than $50,000 on any person convicted of a child pornography

17   production offense.  18 U.S.C. § 2259A(a).

18        The Justice for Victims of Trafficking Act of 2015 separately

19   requires a special assessment of $5,000 per count on any non-indigent

20   person if convicted of an offense relating to the "sexual

21   exploitation" of a child, such as here.  18 U.S.C. § 3014(a)(3).

22   Among other things, this special assessment helps fund grants

23   relating to health and medical services for victims of trafficking.

24   18 U.S.C. § 3014(e)(1), (h)(2).  While the Probation Officer

25

26            [5] The government also discussed these two special assessments
     with the Probation Officer, and understands that a revised PSR and/or
27   addendum may be issued to address the (1) Amy, Vicky, and Andy Child
     Pornography Victim Assistance Act of 2018, and (2) Justice for
28   Victims of Trafficking Act of 2015.

recommended that the Court impose a $5,000 special assessment under this act, the provision expired automatically on September 11, 2022. (Dkt. No. 43, Recommendation Letter, at 1.)  To the extent the Justice for Victims of Trafficking Act is reinstated (as has been the case in previous years) by the date of the sentencing hearing, the government will reassess if and how to restructure its recommendation as to special assessments.

Based on the current information from the PSR and the information amassed by the government during the course of its investigation, as well as the current state of the law, the government recommends a special assessment of $10,000 under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, and $100 for each count of conviction under 18 U.S.C. § 3013 ($200 total).  Should the Court order the requested special assessments totaling $12,000, the government would not recommend a fine at this time.

**V.   CONCLUSION**

Based on the facts of this case, the government recommends a sentence of life (to consist of 30 years of Count 1 and life on Count 2 of the Information, to be served concurrently), a lifetime period of supervised release, and requests that the Court enter the agreed-upon restitution of $8,000 to Victim #1 (Dkt. No. 58), and impose special assessments of $10,200 total ($10,000 under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, and $200 under 18 U.S.C. § 3013).