E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KATHY YU (Cal. Bar No. 268210)
Assistant United States Attorneys
Violent and Organized Crime Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2431
    E-mail:   kathy.yu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>BILLY EDWARD FREDERICK,<br>   aka "A4SBILL@GMAIL.COM," and<br>     "BILLME@GMAIL.COM"<br><br>      Defendant. | No. CR 21-340-DSF<br><br>GOVERNMENT'S RESPONSIVE SENTENCING POSITION FOR DEFENDANT BILLY EDWARD FREDERICK<br><br>**SENTENCING DATE:**<br>October 24, 2022 at 10 A.M. |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Kathy Yu, hereby files its responsive sentencing position for defendant Billy Edward Frederick ("defendant").

    The government's responsive sentencing position is based upon the attached memorandum of points and authorities, the previously filed exhibits (under seal), the files and records in this case, the Presentence Investigation Report, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

```
Dated: October 3, 2022          Respectfully submitted,

                                E. MARTIN ESTRADA
                                United States Attorney

                                SCOTT M. GARRINGER
                                Assistant United States Attorney
                                Chief, Criminal Division


                                     /s/
                                KATHY YU
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA
```

ii

**TABLE OF CONTENTS**

I.   INTRODUCTION...............................................1

II.  DEFENDANT'S GUIDELINES CALCULATIONS........................1

    A.   Sadistic, Masochistic Conduct, or Depictions of
        Violence Under U.S.S.G. § 2G2.1(b)(4).....................2

    B.   Vulnerable Victim Under U.S.S.G. § 3A1.1(b)(1)............4

    C.   Repeated and Dangerous Sex Offender Under U.S.S.G. §
        4B1.5.....................................................6

III. DEFENDANT'S PROFFERED REASONS DO NOT WARRANT A VARIANCE....**7**

    A.   Defendant's Risk Assessment Report Presents Fatal
        Errors....................................................7

    B.   Defendant's Trauma as a Child............................10

    C.   Defendant's History and Characteristics..................11

**TABLE OF AUTHORITIES**

Federal Cases:                                                    PAGE(S)

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579(1993) ................................................. 7

United States v. Byers,
  730 F.2d 568 (9th Cir. 1984) ....................................... 7

United States v. Irving,
  554 F.3d 64 (2d Cir. 2009) ......................................... 4

United States v. O'Brien,
  50 F.3d 751 (9th Cir. 1995) ........................................ 4

United States v. Rearden,
  349 F.3d 608 (9th Cir. 2003) .................................... 3, 4

United States v. Royal,
  442 F. App'x 794 (4th Cir. 2011) ................................... 5

United States v. Shouse,
  755 F.3d 1104 (9th Cir. 2014) ...................................... 2

Federal Statutes:

18 U.S.C. § 3553(a)................................................. 10

18 U.S.C. § 3013.................................................... 1

Federal Rules:

Fed. R. Evid. 702................................................... 7

## I. INTRODUCTION

Defendant's attempts to minimize, downplay, and excuse his years-long exploitation of dozens of Philippine boys as simply altruism should be rejected – as should his request for a 120-month sentence. Casting himself as a kind-hearted, selfless individual, defendant claims his "initial motivation . . . was to help people get out of poverty and difficult situations," and that he was simply helping "people he saw as his friends in the Philippines, not hurt them." (Dkt. No. 60 at 4, 12.) The record makes clear that defendant's contact with numerous Philippine boys was not driven by philanthropy, but to feed his appetite for incestuous child sex abuse material.

The government submits this responsive sentencing position to address (1) defendant's Guidelines Calculations, and (2) defendant's proffered mitigation. (Dkt. No. 60.) The government stands by its initial recommendation, namely, a sentence of life (to consist of 30 years on Count 1 and life on Count 2 of the Information, to be served concurrently), a lifetime period of supervised release, and requests that the Court enter the agreed-upon restitution of $8,000 to Victim #1 (Dkt. No. 58), and impose special assessments of $10,200 total ($10,000 under the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, and $200 under 18 U.S.C. § 3013).

## II. DEFENDANT'S GUIDELINES CALCULATIONS

The defendant objects to the following three enhancements, which the government addresses in turn.

### A. Sadistic, Masochistic Conduct, or Depictions of Violence Under U.S.S.G. § 2G2.1(b)(4)

Defendant objects to the application of the sadistic or masochistic conduct specific offense enhancement because defendant "did not inflict any pain or suffering on anyone else," and that the cited example shows that the victim was "unable" to engage in the anal penetration requested by defendant. (Dkt. No. 60 at 6.) Not so.

As a legal matter, the government agrees with the Probation office that this four-level increase applies so long as the "offense involved material that portrays sadistic or masochistic conduct or other depictions of violence." (PSR ¶ 34.) In considering whether the offense involved "sadistic or misconduct conduct or other depictions of violence," these words are given their "plain meaning." See United States v. Shouse, 755 F.3d 1104, 1107 (9th Cir. 2014). As explained by the Ninth Circuit, sadistic content "involves [the] infliction of pain upon a love object as a means of obtaining sexual release," "delight in physical or mental cruelty," or "excessive cruelty." Id. (cleaned up). "Masochism" is "sexual gratification through the acceptance of physical abuse or humiliation," while "violence," as applied in this narrow context, is the "exertion of any physical force so as to injure or abuse." Id. (cleaned up).

Here, while defendant is correct that one of his victims apologized for being unable to "take in all the dick of my brother," this victim did attempt said conduct – at defendant's demand that the victim "need[ed] dick in [his] butt and mouth again." (Ex. A at 37-38.) Indeed, after performing the requested acts, this victim

2

apologized profusely, telling defendant that the "head [of his brother's penis]" was "very hurt to my asshole." (Ex. A at 37-38.)[1] Based on the entire context of the conversation, it is clear that defendant directed that the victim perform sex acts, and then the victim apologized for not being able to fully perform what defendant had asked for, but that he had tried and had suffered pain as a result. The Ninth Circuit has made clear that the "[s]ubjection of a child to a sexual act that is necessarily painful . . . is sadistic." See United States v. Rearden, 349 F.3d 608, 622 (9th Cir. 2003). The minor victim's clear and unequivocal expression of pain here ("very hurt to my asshole") directly stemming from defendant's demands for such content for sexual release ("you need dick in your butt . . . again") is sadistic, masochistic, and a depiction of violence.

The instance cited relied by the Probation Office is not the only example in the record where defendant directed sadistic or masochistic conduct or other depictions of violence, however. In another instance, defendant agreed to pay a victim for child sex abuse material, and then the victim sent two images[2] of an erect penis with blood and other bodily fluids. (Ex. D at 5.) In so doing, the victim informed defendant that he had a "problem," and the boy with which he performed the sex acts was "bleeding" and "crying in pain" because he was a "virgin" prior to filmed sex acts, and the child would need to go to the "nearest hospital." (Id.) Once again,

---

[1] Defendant admitted these facts in his plea agreement as well. (Dkt. No. 26 at 15.)

[2] To the extent defendant continues to contest this enhancement as well as the facts set forth herein, the government will have these two images available for the Court's inspection at the sentencing hearing so that it may determine whether the images constitute portrayals of sadistic, masochistic, and/or depictions of violence.

3

the victim's clear expression of physical pain – coupled with explicit photographs showing what appeared to be blood – provides the requisite evidence to warrant application of this enhancement. E.g., Rearden, 349 F.3d at 622 ("sadistic" conduct enhancement met where the "pictures portray" "a sexual act that is necessarily painful").

### B. Vulnerable Victim Under U.S.S.G. § 3A1.1(b)(1)

Despite acknowledging the victims asked him for money for necessities (Dkt. No. 26 at 14-15) and insisting that he gave them money out of the goodness of his heart, defendant claims the record lacks evidentiary support to show that the victims were "unusually vulnerable for reasons unrelated to age." (Dkt. No. 60 at 7.) The PSR stated that defendant "asserted dominance over [his victims] and exploited their lack of finances for his sexual gratification." (PSR ¶ 39.) A two-level adjustment "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." Application Note 2 to U.S.S.G. § 3A1.1(b)(1). This does not require the government to prove that defendant "targeted" the victim because of this "unusual vulnerability," however. See United States v. O'Brien, 50 F.3d 751, 756 (9th Cir. 1995) ("Appellants' actual or constructive knowledge [of the vulnerability] is therefore sufficient to trigger § 3A1.1").

First, based on the record before the Court, the government sets forth the following unusual vulnerabilities of the victims in this case: (1) the victims' lack of financial resources and education (compare United States v. Irving, 554 F.3d 64 (2d Cir. 2009) (application of vulnerable victim adjustment upheld where the minors were "especially vulnerable because anyone who comes along and offers

4

the promise of a free meal has a special attraction to people in that economic and social circumstance") with Ex. A at 38-39 (requesting money for summer camp), 35 (school supplies and fees); 33 (new shoes); 25 (house was burned down) 21 (sick mom)); and (2) the victims' family backgrounds and lack of education (compare United States v. Royal, 442 F. App'x 794, 798 (4th Cir. 2011) (application of vulnerable victim adjustment upheld where minors came from "dysfunctional families," with one of them "living essentially in a dumpster almost" in which defendant "was able to take advantage of them because of their vulnerability" with Ex. A at 9 (mother of victim saying that she "agree[d]" to abuse of her son)).

Second, defendant was actually aware of these vulnerabilities. His victims constantly told him about their need for money for school supplies, food, medicine, and other necessities. Indeed, when one victim asked defendant for money for bags, school supplies, and tuition, defendant – expressly on notice of these victims' financial conditions – callously joked that "[t]his fall, I will pay for every boy in your city to have a new backpack with school supplies." (Ex. A at 35.) Defendant was also on notice of his victims' dysfunctional family situations. For example, a mom of one of the victims apologized for her lack of education, and told defendant she was "just grade 6 graduate," worked as "street sweeper," it was "not enough to give [a] life" to her son, and because of this, she "agree[d]" to defendant's exploitation of her son. (Ex. A at 9.) In response, defendant said that he had "watched [the victim] grow up" and "the only thing [the victim] has to offer me is his body." (Ex. A at 9.)

Defendant knew and exploited his victims' unusual vulnerabilities, and the two-level adjustment under U.S.S.G. § 3A1.1(b)(1) should apply.

**C.   Repeated and Dangerous Sex Offender Under U.S.S.G. § 4B1.5**

Defendant erroneously claims that because he did not have any prior convictions and that some other instances of production in this case were included in the factual basis, then this five-level enhancement cannot apply. (Dkt. No. 60 at 8-9.) However, the Application Notes are clear that defendant need not be convicted of prior child pornography production offenses to warrant application of the "repeated and dangerous sex offender" enhancement. Application Note 4 to U.S.S.G. § 4B1.5 ("An occasion of prohibited sexual conduct may be considered for purposes of subsection (b) without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion.").

First, defendant's admissions in the factual basis alone surpass the "two separate occasions" of "prohibited sexual conduct with a minor," as in, the production of child pornography. In his factual basis, defendant admitted "he produced over 5,000 images and videos of child pornography of at least 35 different children." (Dkt. No. 26 at 16.)

Second, and on a separate basis, the government tabulated the following instances of production of child sex abuse material based on the exhibits attached to its original sentencing papers – which, again, are only a fraction of the offense conduct – and which totaled over a dozen occasions of prohibited sexual conduct. (E.g., Ex. A at

6

2, 8, 15, 16, 18, 20; Ex. B at 9; Ex. D at 4, 5, 6, 12.)  This far exceeds the "two separate occasions" of "prohibited sexual conduct with a minor" required to trigger the repeated and dangerous sex offender enhancement under U.S.S.G. § 4B1.5.

**III. DEFENDANT'S PROFFERED REASONS DO NOT WARRANT A VARIANCE**

Defendant offers three primary reasons for a 120-month sentence: (1) an expert report concluding that he allegedly has a 15% risk of recidivism (Dkt. No. 60 at 10, 17); (2) defendant's own childhood abuse (id. at 11); and (3) defendant's family and community support (id. at 18).  The government addresses each of these meritless reasons below.

**A.   Defendant's Risk Assessment Report Presents Fatal Errors**

The "risk-assessment report" concluding that defendant would be in the "low-risk range" for "recidivism" by Dr. Booker should be given little or no weight.  An expert opinion must be based on (1) "the expert's scientific, technical, or other specialized knowledge" to "help the trier of fact to understand the evidence, (2) "sufficient facts" in the case, and (3) must "reliably apply" scientific principles to the "facts of the case."  Fed. R. Evid. 702. The trial judge has a "gatekeeping" obligation to "ensure that any and all scientific testimony ... is not only relevant, but reliable." See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589(1993). The trial court has wide latitude to exclude expert testimony. United States v. Byers, 730 F.2d 568, 571 (9th Cir. 1984).  Because the report rendered by Dr. Booker fails on all accounts, it should be excluded in the first instance, or given to little or no weight.

7

First, Dr. Booker's conclusion that defendant would be in the low-risk range for "repeated possession of child pornography" would not help this Court because it is based on incorrect or incomplete data. Throughout his report, Dr. Booker refers to defendant's "viewing" of "child pornography," whereas defendant's offenses involved completely different crimes: the production of child sex abuse material and the enticement of a child to engage in illegal sexual activity. (E.g., Ex. A at 4 (defendant "***would be in the Low-Risk range for repeated possession of child pornography***") (emphasis in original); Ex. A at 5 ("***[T]he alleged behavior in this case involving viewing child pornography is an artifact of Billy's overall addiction to pornography in general . . . .***") (emphasis in original); Ex. A at 8 ("Prior to this involvement in this case, these psychiatric conditions interacted to weaken his capacity for consciously controlling his compulsive desire to view pornography.").) Dr. Booker's apparent lack of basic understanding as to the crimes charged in this case render his opinions irrelevant.

Second, Dr. Booker's conclusion that defendant is at low risk for recidivism is also largely based on defendant's alleged expressions of remorse. (E.g., Ex. A at 6, 7, and 8.) Again, these expressions of remorse, however, appear to be limited to the possession of child sex abuse material – not enticing, coercing, and persuading young boys in the Philippines to produce images and videos, and to engage in oral copulation with a minor and sodomy with a minor, as he admitted by pleading guilty in this case. For example, Dr. Booker notes that defendant "consistently expressed regret for his involvement in the case, he accepted full

responsibility for his alleged conduct and **_acknowledged viewing and masturbating to child pornography_**." (Ex. A at 7 (emphasis supplied).) Responsibility for "viewing and masturbating to child pornography," however, is not the same as creating and directing such materials, ordering Philippine boys to engage in sex acts, and coordinating with Philippine adult facilitators to create a market for this material.[3]

Third, another fatal flaw with Dr. Booker's report is that while he claims to apply the Child Pornography Offender Risk Tool ("CPORT"), he fails to explain how he scored each factor, what materials he reviewed and relied on, and how he inexplicably concluded that defendant was "CPORT = 3." (Ex. A at 4.) The CPORT analysis is a seven-point test, consisting of the following points (each yes equals one point):

"(a) offender age at time of the index investigation,

(b) any prior criminal history,

(c) any contact sexual offending,

(d) any failure on conditional release,

(e) admission or diagnosis of sexual interest in children,

(f) more boy than girl child pornography content, and

(g) more boy than girl other child-related content."

Dr. Booker's report is silent on whether he reviewed the Information in the case, or the conversations in this case between defendant and his victims – even though the test he purported to

---

[3] Indeed, at the change of plea hearing in this case, defendant initially balked at the factual basis, claiming that the boys "pressure[d]" him to "accept photos so that [he] would send them more money," causing the Court to repeat and clarify, "They were pressuring you to accept photos?" (Dkt. No. 40 at 37.)

9

apply required a comparison of whether defendant had greater boy versus girl content. (Ex. A at 4.) Dr. Booker also never requested to view the voluminous child sex abuse photographs and content in this case. Dr. Booker's "conclusions" relating to defendant's risk of recidivism, therefore, are untethered to the crimes or factual record before the Court, and should be rejected.

Finally, even assuming this Court gives some minimal weight to Dr. Booker's conclusions regarding defendant's risk of recidivism, this is just one goal of sentencing. The Court must also fashion a sentence to reflect the "nature and circumstances of the offense," "the history and characteristics of the defendant," and "the seriousness of the offense," as well as "to promote respect for the law," among other things. 18 U.S.C. § 3553(a).

**B.   Defendant's Trauma as a Child**

Defendant claims that he was sexually abused as a child and that trauma somehow caused him to later produce videos and images of boys raping other boys. To the extent that defendant suggests there is a correlation between being a victim of child molestation and his adult engagement in serial, sexually exploitative conduct of young boys, the Court should reject this notion. While the correlation may appear attractive as an explanation for inexplicable conduct, reality does not bear it out. Indeed, girls – who make up a disproportionately large percentage of child exploitation victims – do not also make up an equally large percentage of child exploitation offenders. Regardless of the patent fallacy in his argument, research in this area further illustrates that defendant's argument that being abused caused him to abuse is scientifically unsupported.

"The victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend. However, there are serious limitations to this explanation[.]." See generally, Lambie, Ian, et al., "Resiliency in the Victim-Offender Cycle in Male Sexual Abuse," SEX ABUSE: A JOURNAL OF RESEARCH AND TREATMENT, Vol. 14., No. 1 (2002) at 43.

At bottom, defendant's prior trauma from decades ago does not and cannot excuse or justify his crimes here. If anything, defendant's abuse should have made him more empathetic to the permanent harm such abuse causes.

### C. Defendant's History and Characteristics

While defendant's higher education, employment, and family support are cited as mitigation (Dkt. No. 60 at 12), the government considers them aggravating factors. As detailed in the government's opening papers, defendant's abuse of Philippine boys was not a one-time momentary lapse in judgment. Defendant knew what he was doing. He had a high-paying job, and the unwavering support of a long-term partner, and other family and friends – all things his victims did not have. He knew he was not donating money to "friends" out of the goodness of his heart; he gave them money for food, school, clothes, and other necessities – so long as they produced the incestuous child sex abuse material he demanded. (Dkt. No. 61 at 7-8.) His education and wealth, flaunted by him in the commission of the crimes, should not be considered mitigation by this Court to vary downward to the mandatory minimum sentence of 120 months.

11